McFARLAND and others *v.* SELBY SMELTING & LEAD CO.

*(District Court, D. California.   May 28, 1883.)*

1. COLLISION—STEAMER TOO NEAR WHARF—FAULT.
    A small stern-wheeler, after giving the usual preliminary signal, a long whistle, was moving slowly and carefully out from her slip, about 2 o'clock in the day, when her stern came into collision, about 90 feet from the wharf, with a steamer that was proceeding at a moderate rate of speed, but within 100 feet of the wharf. *Held,* that the steamer was in fault in proceeding so near to the wharf, and in not noticing the signal of the stern-wheeler and avoiding the collision.

2. SAME—FAILURE OF SMALL STERN-WHEELER TO HAVE LOOKOUT AT STERN —DAMAGES.
    It was not a fault on the part of the stern-wheeler not to have a lookout at her stern, and, as no other fault is alleged, the whole damage for the collision must be borne by the steamer.

In Admiralty.

*W. S. Goodfellow,* for libelant.

*Chas. Page,* for claimants.

HOFFMAN, J.   The facts upon which the libelant relies for a relief for a recovery are substantially as follows: On the twelfth of May, 1882, about 2 o'clock P. M., the small stern-wheeler Pilot was slowly and carefully backing out from her berth on the north-westerly side of Jackson-street wharf, in this city, on a trip to Black Point.   She had given the usual preliminary signal of her intention to come out by blowing a long whistle.   She had proceeded down the slip until her stern was about 80 or 90 feet beyond or outside Jackson-street wharf, when a whistle was blown, to which her master at once replied by blowing his own whistle, and ringing the bells to stop and reverse his engine.   Before her stern-way was entirely

overcome the vessel was struck by the steamer Bullion, and the damage for which this suit is brought was inflicted.

The master of the Pilot states that when he first saw the Bullion she was about 50 feet off, and that the collision occurred about a minute afterwards. The libel avers that the Bullion was going at the rate of about seven miles an hour.

These statements are obviously inconsistent. The testimony shows, I think, very clearly that the speed of the Bullion previously to blowing her whistle did not exceed three and one-half miles an hour; probably it was less. She is represented to be one of the slowest boats on the bay. Her bottom was very foul, and she had a young flood against her. This latter circumstance is stated as the reason or excuse for her pursuing a course so near to the ends of the wharves.

C. J. Young, a deck hand on board the Bullion, states that the collision occurred about five seconds after he saw the Pilot with her pilot-house opposite the end of the wharf; and although little reliance can be placed upon estimates of minute intervals of time made under such circumstances, his guess is probably much nearer the truth than that of the master. As the collision occurred between two steamers, and in open daylight, it is obvious that one or both of them must have been in fault.

Capt. Young, master of the Bullion, describes the accident as follows: He first saw the Pilot when "he was about one-third north of Washington street, between that and one-half to Jackson street." Looking through the large doors in the shed, by which Jackson-street wharf is covered nearly to its outer end, he saw a wheel turning, and at once knew that a vessel was coming out of the slip, the mouth of which he was approaching. He at once blew his whistle, rang his bells to stop and reverse, and put his helm to port. This was done "quicker than it takes to tell,"—"inside of three seconds." The boat obeyed the helm slowly. "She probably fell off to starboard between two and three points." The Pilot continued to back out of the slip, and, still retaining stern-way, struck the Bullion a little abaft the foremast. Capt. Young asserts, with great positiveness, that she stopped, but did not reverse her wheel. In this statement he is contradicted by every witness who was on board the Pilot, and I think is not corroborated by any witness for the respondent. The statement is, moreover, intrinsically improbable. When, on discovering that a vessel was coming out of the slip ahead of him, he blew his whistle, the master of the Pilot must have known that a steamer was passing along the ends of the wharves, and that a collision was to be apprehended. The obvious mode of avoiding it. was to stop and reverse. This, he and all on board his vessel say he in fact did; to suppose him not to have done so would be to attribute gross and inexplicable negligence. But Capt. Young's account of the accident is obnoxious to grave criticism. He states that when he first saw the Pilot's wheel turning he was one-third or one-

half the distance from Washington-street wharf to Jackson-street wharf. This places him, perhaps, 80 feet to the southward of Jackson-street wharf. The latter is 100 feet wide. The slip down which the Pilot was backing is 175 feet wide. The Pilot was about the middle of it. But assuming she was nearer to the Jackson-street than the Pacific-street side, and within 60 or 70 feet of the former, the collision must have been at least 240 or 250 feet to the southward. The Bullion was also, her master states, 100 or 115 feet out from the end of the wharves. If, then, she instantly stopped and reversed, as the captain states, it is difficult to see how the accident occurred. With regard to the speed of the Bullion, her master states that with a clean bottom she will go five knots. "In the condition she was in when the collision happened I don't believe she could go four." "With the tide against her, only one and one-half or two knots. Her bottom is now over two inches thick with mussels from end to end."

It is difficult to see how a vessel not capable of making over one and one-half or two knots with the tide against her, could have failed against a young flood to stop and acquire stern-way in a distance of 240 to 250 feet. And in this computation I have not included the distance between the Pilot's stern and the end of the wharf when first seen by the master of the Bullion, and which, by the latter's account, must have been considerable. Nor have I taken into account any deflection of the Bullion's course caused by her putting her helm to port. The statement of the master of the Bullion, that the latter vessel was struck a little abaft her foremast by the corner of the Pilot's fan-tail, is corroborated by the testimony of his deck hands. It is contradicted by every one on board the Pilot, and particularly by a young man who was standing on the after-part of the Pilot's promenade deck and within four feet of her taffrail, and who observed the occurrence. But in the determination of this point we are not left to a comparison of the credibility or opportunities for observation of the witnesses on board the steamers. Immediately after the accident the Pilot was inspected by the United States inspector of hulls and the inspector of boilers for this district. They found a deep indentation or gash in the port timber of her fan-tail, which they unhesitatingly concluded must have been made by the stem of some vessel striking her at nearly a right angle. The frame of the fan-tail seemed to have been pushed over to starboard, and the large axle on which the wheel revolved was so bent that the inspectors ordered it to be removed and straightened. The corner of the fan-tail which the respondent's witnesses say struck the Bullion was found to be uninjured. If to this we add the fact that the Bullion sustained little or no injury,—"not two bits worth," as the respondent's witnesses admit,—no doubt can, I think, be entertained as to which vessel struck the other.

It is contended on the part of the libelant that the course of the

Bullion was laid too near the line of the ends of the wharves, and especially to that of the Jackson-street wharf, which is covered nearly to its extremity by a shed. Much testimony was taken as to the prevailing usage of steamers, running along the city front, with respect to the distance from the wharves at which they commonly or may safely go. There seems to be no settled rule or practice on the subject, and the experts differ in their estimate of what should be considered a safe distance. Steamers, it appears, frequently run by the wharves at no greater distance from them than from 20 to 50 feet. They seem in the habit, as one of them said, of taking their chances, and to be managed in many instances in an imprudent, if not reckless, manner.

In the recent case of *The Monticello*, 15 Fed. Rep. 474–476, the court observes:

"The state statute which requires steamers to proceed in the middle of the stream, the local rules, and repeated decisions of the courts, all unite in condemning navigation so near to the slips as dangerous and unjustifiable. The matter has been so repeatedly discussed, and the obligation of steamers to keep away from the ends of wharves and ferry-slips so forcibly stated, that it is wholly unnecessary to repeat it here." *The Relief*, Olc. 104; *The Favorita*, 18 Wall. 598, 601, 602; 8 Blatchf. 539, 541; 1 Ben. 30–39.

It is not necessary in the present case to attempt to determine the minimum distance from the wharfs at which vessels may safely proceed. The collision occurred—Unless the Pilot omitted some precaution she might have taken, such as reversing her wheel, on hearing the Bullion's whistle, or failed to keep a proper lookout, (a point which will presently be considered,) the Bullion was in fault, either in omitting to take means to avoid the accident when the Pilot was first observed, (an omission of which she was not guilty, according to the positive statement of her master,) or in being too near the ends of the wharfs. If she was, as the answer alleges, between 100 and 150 feet distant from them, then the result proves that between 100 and 150 feet was too near. But it is extremely improbable that she was even as much as 100 feet from the wharfs; certainly not 150. If, as is established, I think, by the clear preponderance of testimony, the Pilot's stern projected beyond the end of the wharfs only 90 feet when she was struck, it is clear that the Bullion must have been within that distance from the end of the wharf. And even if at the moment of collision the Pilot's bow was nearly even with the end of the wharf, the Bullion's stern must have been within 123 feet of it, for the Pilot is only 123 feet long. The Bullion's midships was, of course, somewhat nearer, and this position the Bullion must have assumed after putting her helm to port and falling off to starboard some two and one-half points, when she was 240 feet to the southward.

I have already endeavored to show that this distance is overrated by the master of the Bullion,—a conclusion confirmed by the testimony of the engineer of the vessel. He states that he heard a blast

from a whistle, and immediately afterwards he received signals to slow, stop, and back which he obeyed, and that "immediately" afterwards the vessels came together; that after the wheel was reversed it did not make "more than one revolution,—not more than two;" "had not time to get stern-way on her." It is obvious that the Bullion could not have made 240 feet before her wheels could turn over twice.

I am satisfied that the Bullion was not 100 feet from the wharves, although the libel, somewhat incautiously, admits that she was at that distance from them. But whether she was or not, the fact of the collision proves her to have been too near, unless it appears that the collision was caused by this fault of the Pilot.

In the case of *The Favorita*, 18 Wall. 602, the supreme court observes:

"There is a good deal of testimony bearing on the point of the distance of the Favorita from the shore at the time of the collision; but it is unnecessary to consider it, for the estimate of witnesses in times of sudden peril, on such a subject, is mere conjecture, and, necessarily, inconclusive. *That the ship was out of the path she should have occupied, and improperly close to the Brooklyn shore, is evident enough, because both vessels were in perilous proximity the moment the Manhassett emerged from her slip.* Had she been at a suitable distance from the shore, or going with a materially lessened speed, the collision would not have happened, and the inquiry arises whether she alone must suffer for the loss that occurred."

These observations apply, *mutatis mutandis*, with much force to the case at bar, except that no suggestion is here made that the speed of the Bullion was too great. The Pilot, before starting, gave the usual signal that she was about to move out of the slip by blowing a long whistle. This signal, which should have given timely warning to the Bullion, and, if noticed, have enabled her to avoid the accident, was not heard by the Bullion. No sufficient explanation of this apparent inattention and carelessness is offered. It may be considered to have caused the accident, even more directly than the improper course of the Bullion.

The only fault of which the Pilot is accused is the omission to station a lookout on the after-part of the hurricane deck. That this is a useful, prudent precaution, and that it is generally taken by the larger boats, seems to be established. But the practice can hardly be considered general—certainly not universal—with the small stern-wheelers which navigate the waters of the bay. The distance between the pilot-house of the Pilot and the furthest point aft, at which a lookout could have been stationed, was about 60 or 70 feet. At the rate at which the pilot was going this distance would be traversed in about 11 or 12 seconds. In the larger boats, where the distance from the pilot-house to the taffrail is more than twice as great, an officer is often stationed at the stern when the boat is backing out of her slip, especially at night or in thick weather. But this lookout is

either the captain, pilot, or other officer having authority to give orders directly to the engineer, and for this purpose a bell-handle is provided on the after-part of the deck, the wire of which leads directly to the engine-room.

With the usual equipage of stern-wheelers the lookout would necessarily be an ordinary deck hand, perhaps of limited experience and intelligence. I am inclined to think that in practice the Pilot would not instantly and blindly obey any signal given by the lookout, but would wait the few seconds necessary to bring the approaching vessel within his own line of vision, and to enable him to judge for himself what measures to adopt.

However this may be, I am clearly of opinion that the respondent has failed to establish such a generally recognized rule, with respect to lookouts at the stern of the smaller steamers on this bay, as would justify the court in apportioning the damages for a failure to observe it. And especially is this the case when it does not appear that its observance would have had any material effect to avert the accident. There was a lookout or a person looking out on the after-part of the promenade deck—a position in some respects more favorable for observation than the corresponding position on the hurricane deck. This person noticed the Bullion at, at least, as early a moment as a lookout on the hurricane deck would have done. He at once notified the captain of the Pilot. The latter, therefore, had as early information of the approach of the Bullion as a lookout stationed by himself on the hurricane deck could have given. The master of the Bullion states that if the Pilot had had a lookout he could have seen the Bullion as soon as he (the master of the Bullion) saw, through the openings of the sheds, the Pilot's wheel. But he also says that he immediately blew his whistle. The captain of the Pilot had thus almost instantaneous notice of the approach of the Bullion, and nearly, if not quite, as soon as he could have received it from a lookout aft on his own vessel. To this it may be added that the reproach of not having a lookout aft comes with an ill grace from the Bullion, for she herself had not a lookout stationed forward. The deck hands were on deck, but engaged in the performance of their general duties.

I am, therefore, of opinion that the Bullion is liable for the whole damages sustained by the Pilot. A reference will be had to the commissioner to ascertain and report their amount.