## THE STEAM TUG LUCKENBACH.

### LEWIS LUCKENBACH et al. v. THE GEORGIA and Claimants.

(*Circuit Court of Appeals, Fourth Circuit.* April 12, 1892.)

COLLISION—TUG AND STEAMER—RULE 19.

A tug rounding Town point, in Norfolk harbor, under considerable speed, suddenly came in sight of a steamer just under way leaving her wharf, and heading out into the harbor towards Portsmouth. The steamer blew one whistle and kept her course. The tug replied with two whistles, and, putting her helm to starboard, attempted to cross the steamer's bow. The steamer promptly reversed, but could not avoid a collision. *Held*, that the tug, having the steamer on her starboard side, was governed by rule 19, (Rev. St. § 4233,) and bound to keep out of the way. *Held*,

that the danger of the situation arose from the speed of the tug while rounding a point which shut out of view vessels navigating the harbor beyond, and that it was this fault in her navigation which prevented her obeying the rule. *Held*, that the test of safe speed is whether it is such as allows the vessel to comply with the duty imposed upon her. *Held* that, the tug being clearly in fault in running at too great speed, and in failing to obey the rule, the burden was cast upon her to establish some fault on the part of the steamer contributing to the disaster, and, having failed to do so, the decree of the district court, holding her solely to blame, should be affirmed.

(*Syllabus by the Court.*)

Appeal from the District Court of the United States for the Eastern District of Virginia.

In Admiralty.

Statement by MORRIS, District Judge:

These were cross-libels filed by the owners of the steamer Georgia and the owners of the steam-tug Luckenbach to recover damages resulting from a collision in the harbor of Norfolk about 4 o'clock in the afternoon of May 9, 1891. The Georgia had just left her Norfolk wharf, and was proceeding southerly towards her wharf in Portsmouth. The steam-tug was coming down the river in a northerly direction. The collision occurred about 210 yards from the wharf, which the Georgia had just left, and both vessels were seriously damaged. The tug was cut into on her port bow about 30 feet from her stem, and the stem of the Georgia was broken and twisted over from port to starboard. The Georgia is a large passenger steamer, about 300 feet in length and 40 feet in breadth. The tug was built for ocean towing, and is 130 feet long and 25 feet in breadth. The libel of the owners of the Georgia states that the steamer was leaving her wharf on her regular route to Portsmouth, and was proceeding slowly, when the officer in charge saw the tug on his port bow passing close to a steamer lying at a wharf on Town point, which projects into the river; that he signaled the tug with one whistle and the tug answered with two whistles; that, seeing the tug was advancing rapidly, he blew danger signals, and reversed the Georgia's engine to avoid her, but the tug continued approaching under a starboard wheel, and ran violently across the Georgia's stem. The answer and cross-libel of the owners of the tug state that she was moving down the harbor, and heard one blast of a whistle as if coming from a steamer lying at a wharf below Town point and about to move from her wharf; that the tug starboarded and gave two whistles, meaning to go out further into the river; that immediately afterwards the tug passed a steamer lying at the wharf on Town point, and was then able to see the Georgia, which appeared to be hugging the western line of her wharf; that a few seconds later the Georgia was seen suddenly and rapidly to shoot out from her wharf into the stream, and continued to move rapidly in that direction until a collision was inevitable, notwithstanding the tug had put her helm hard a-starboard and had reversed her engines, and before the collision had overcome her forward motion. The district judge found that when the two steam-vessels came in view of each other they were both under way, and that the Georgia was on the

starboard side of the tug; that the situation was controlled by rule 19, (Rev. St. § 4233,) which required the tug to keep out of the way; that the tug attempted to do so by putting her helm to starboard and crossing the bows of the Georgia; and that her failure in the attempt and the consequent collision was due to the fact, which the court found, that while running in the harbor, and near the ends of the wharves, and when about to round a projecting point of land covered with buildings, which shut out her view, she maintained such an imprudent rate of speed that when she could see the Georgia she was so close and going so rapidly that it was doubtful, if not impossible, if any maneuver she could adopt would have enabled her to avoid the collision. The district court found that the Georgia had not been wanting in any proper precaution, and had done nothing to embarrass the tug, and was not in fault. A decree was entered awarding to the Georgia her full damages, and the owners of the tug have appealed.

*Robert M. Hughes,* for appellants.

*White & Garnett,* for appellees.

Before Fuller, Chief Justice, Bond, Circuit Judge, and Morris, District Judge.

Morris, District Judge, (*after stating the facts as above.*) The appeal proceeds upon the ground that the district court was in error in finding (1) that the speed of the tug was excessive; (2) in holding that the situation was such that rule 19 (Rev. St. § 4233) was applicable, and the Georgia the privileged vessel, and the duty cast upon the tug to avoid her. The appellants contend that the Georgia was moving as fast or faster than the tug, and so near to the wharves on the Georgia's port side that the tug could only avoid her by passing on her starboard side; that the tug attempted to do this, and gave a signal of two blasts, and put her helm to starboard, and would have succeeded had the Georgia done her part by promptly reversing; that because of the nearness of the wharves on the Georgia's port side, and the obstruction of the view by the projecting land called "Town Point," the situation was governed by the special instructions contained in rule 24, (Rev. St. § 4233:)

"In construing and obeying these rules due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case, rendering a departure from them necessary in order to avoid immediate danger."

The testimony contained in the record convinces us that the district court correctly found that the two vessels must have been approaching each other at the rate of 10 miles an hour, or nearly 300 yards in a minute, and we think the decided preponderance of testimony and the necessary inference from proven facts is that the tug was moving at a much greater speed than the Georgia. Aside from the weight of the direct testimony of witnesses apparently disinterested and not connected with either vessel, who state that the speed of the tug in passing Town point was so unusual as to attract attention, it must be conceded that the place of collision was only about 210 yards from the wharf from which the

Georgia had just cast off her stern line. She had been lying in the dock with her bow inshore, and had backed to the end of the dock, and upon a line fast to the end of the wharf had swung around until her bow was in the stream, when she cast off the line and started ahead. As the Georgia is 100 yards long, the distance to the place of collision was only about twice her length, and it is highly improbable, if not impossible, that she could have attained more than steerage way. Witnesses estimate that the tug, in passing Town point, was making 10 miles an hour, but it is, of course, unnecessary to determime how fast she was going to determine whether her speed was imprudent or not. The test of safe speed is whether it is such as allows the vessel to comply with the duty imposed upon her, and to avoid collision with other vessels in the situations in which she may reasonably expect to find them. *The Favorita*, 18 Wall. 598. On a calm, clear day, in a harbor not affected by current or tide, and not crowded, with nothing to embarrass her except the well-known projection in the outline of the wharves, the tug collided with a vessel not over two lengths from the wharf she had just been fast to, and the tug's defense is that coming around the curve she suddenly found herself in such a situation with respect to the other vessel that no sailing rules were applicable, and a collision was inevitable unless the other vessel at once backed into her dock. The explanation of the danger of the situation, in our judgment, is to be found in the imprudent speed of the tug while rounding so near to the wharves on Town point.

The testimony of the master of the tug is not reconcilable with the conceded facts. He testifies that just as he neared Town point, he heard one blast of a whistle from around the point, indicating to him that some steam-vessel was casting off her lines to move from her wharf; that presently, when he had rounded the point sufficiently to see the Georgia, he saw her about 800 feet off, apparently lying at her wharf; that he blew two blasts and put his wheel a-starboard to go further out into the river, and saw the Georgia moving along parallel to the wharves and so close to them on her port side that the tug could not pass between her and them; that, notwithstanding his own original course was, as he claims, over 100 feet off from the wharves, and that under his starboard helm he changed his course six points, the Georgia changed her course and shot out into the river at a speed of at least four miles an hour, and ran down the tug. The statement that the Georgia was first seen apparently stationary, and then proceeding along the line of the wharves, cannot be reconciled with the fact that her bow was so quickly afterwards 200 yards out in the river, and there collided with the tug, which claims to have started from a point 100 feet from the wharves, and to have been running away from them under a hard a-port helm. The mate of the tug, who was at the wheel in the pilot-house, testifies that he heard the signal of one blast as they were rounding the point, and presently saw the Georgia coming out from her wharf, and then the tug blew two blasts, and starboarded her helm and stopped and reversed full speed astern; that when he first saw the Georgia her stern

was very near the wharf and her bows a little off in the stream, and apparently just beginning to move out; that she was on the tug's starboard bow, and appeared to keep her course; that she sounded danger signals soon after the tug blew two whistles. He claims, also, that the tug, at the moment of collision, had stopped her headway, and was nearly still in the water. This testimony of the mate of the tug supports the finding that the Georgia was heading out into the stream, and was just under headway, and was on the tug's starboard side when seen by her. It puts the two steamers in the position of crossing vessels with the Georgia on the starboard side of the tug, with a duty imposed upon the tug by rule 19 to keep out of the way. No doubt the tug did reverse, but the statement that she had lost her headway is refuted by the fact that by the collision the Georgia's bow was violently twisted from port to starboard. If, however, we were to adopt the view urged by the appellants, that although the Georgia was on the tug's starboard side this did not arise from the courses upon which the vessel was proceeding, but merely from the fact that the tug was rounding a projecting wharf, and that the two steamers are to be considered as vessels maneuvering at close quarters about the wharves of a harbor, not governed by rule 19, but each equally obliged to avoid the other, we are not able to see that the tug is placed in any better plight. Under such circumstances her speed would be still more imprudent. Special attention is directed to the caution required to be exercised in such a situation by the note to pilot rule 8:

"N. B. The foregoing rules are to be complied with in all cases except when steamers are navigating in a crowded channel or in the vicinity of wharves; under such circumstances steamers must be run and managed with great caution, sounding the whistle as may be necessary to guard against collision or other accidents."

The appellants invoke rule 24 (Rev. St. § 4233) as justifying their not obeying rule 19, but it is apparent, we think, that the only danger of navigation was created by the tug rounding Town point, with notice that a vessel was leaving her wharf, at such a rate of speed that she was unable promptly to control her movements, and was obliged to attempt to run across the other vessel's bows. Further discussion is unnecessary to show that the district court was right in holding the tug in fault.

The appellants contend that the Georgia was in fault in that (1) she did not back promptly as soon as there was risk of collision; (2) that she had no proper lookout; (3) that her signal of one whistle was improper. It is true that the specially designated lookout of the Georgia was aft, attending to taking in the stern line on which the steamer had swung around into the river, but there is no ground for the contention that the tug was not seen by the first officer and by the quartermaster in the wheel-house as soon as she could be seen around the bows of the steamer which was lying up stream at the Town point wharf. The steamer had just then started ahead, and she at once blew a signal of one whistle as soon as they saw the tug, having previously given a short blast when the line was to be cast off. The signal of one whistle must

have been given as soon as it was possible for those on the Georgia to see the tug, because it was heard by the officers of the tug before they fully saw the Georgia. The collision cannot, therefore, be attributed to the want of a special lookout on the Georgia. When the signal of one whistle was given by the Georgia she was gathering headway on her course, which was about S. by W., while the tug was apparently on a course about N. W. by N., and about 300 yards off on the Georgia's port bow. It was the duty of the Georgia to hold her course, and the signal of one whistle meant that her course was to starboard with reference to the tug, and away from the wharves, and that she would keep it. As the space between the Georgia and the wharves was constantly widening, there was no reason for those in charge of her to suppose that, if the tug was going at a prudent speed, there would not be space between the Georgia's stern and the wharves for the tug to pass. There was nothing, therefore, misleading in the signal. Those in charge of the tug were not misled by it, but, after hearing it, and before they fully made out the movement and course of the Georgia, starboarded and blew their signal of two whistles. It was then that the danger of collision was first apparent to those on the Georgia, and they promptly reversed her engines full speed astern. The appellants contend that the direction of the cut into the tug's bow shows that the tug, at the time of collision, had stopped, and that the Georgia was going ahead, and therefore had not promptly reversed, but the direct proof is too strong to be overcome by inferences drawn from the testimony on that subject. The immediate and primary cause of the collision was the imprudent speed of the tug and her want of caution in rounding Town point so close to the wharves. The burden is upon her to establish some fault or neglect on the part of the Georgia contributing to the disaster, and this, we agree with the district court, the appellants have not succeeded in doing. The decree of the court below is affirmed, with interest and costs of the appeal to be paid by the appellants.