## THE CITY OF AUGUSTA.

### THE CHICAGO.

### OCEAN S. S. CO. OF SAVANNAH v. PENNSYLVANIA R. CO.

(District Court, S. D. New York. June 26, 1900.)

1. COLLISION—STEAMSHIP AND FERRYBOAT—PASSING UNNECESSARILY NEAR NEW YORK PIERS.

It is negligent navigation for a steamship, without necessity, to run at a speed of 8 or 10 knots within 300 feet of the ends of the piers along the New York side of the Hudson, where numerous ferryboats are constantly entering and leaving their slips, which cannot be justified by any previous practice or custom, and which renders such vessel liable for any resulting collision with a ferryboat.

2. SAME—STEAM VESSELS CROSSING—DUTY OF PRIVILEGED VESSEL.

The one of two crossing steam vessels which has the right of way has the right to rely on the performance by the other of her duty to keep out of the way, so long as there is reasonable time and space for her to do so; but, when it becomes obvious that she cannot avoid collision by her own maneuvers, it is the duty of the privileged vessel to at once stop and reverse.

3. SAME—INSUFFICIENT LOOKOUT.

The Chicago, a ferryboat running between New York and the New Jersey shore, and the City of Augusta, a steamship coming in from the sea, came in collision near the end of the New York piers, as the Chicago was about to enter her slip in the night, and the Chicago was sunk, being struck about one-third of her length from the stern. The vessels appeared to have sighted each other at about the same time, which was not until the Chicago was about 200 feet, and the Augusta 400 or 500 feet, from the point of collision, although both carried the usual lights, and there was nothing to obstruct the view between them. The Chicago, being then too near the course of the Augusta to avoid collision by stopping, increased her speed and attempted to pass ahead, signaling her intention; at the same time the Augusta made a similar signal, neither signal being heard by the other vessel. *Held,* that both vessels were in fault for failing to sooner observe each other, and that the Augusta was further in fault in passing up at a speed of 8 or 10 knots within 200 and 300 feet of the ends of the piers, without necessity, and because she failed to stop and reverse until within 25 feet of the Chicago, although it was evident, when she was 300 feet or more distant from the point of collision, that the Chicago was attempting to pass ahead and that collision could not otherwise be avoided.

In Admiralty. Cross libels for collision and petitions for limitation of liability by the owners of both vessels.

Robinson, Biddle & Ward and H. Galbraith Ward, for Pennsylvania R. Co.

Davies, Stone & Auerbach, Julian T. Davies, and Herbert Barry, for the City of Augusta and Ocean S. S. Co.

Ellictt, Jones & Escher, J. J. Macklin, and Cowen, Wing, Putnam & Burlingham, for various damage claimants.

BROWN, District Judge. A few minutes before 1 o'clock on the morning of October 31, 1899, as the steamship City of Augusta was coming in from sea and proceeding near the New York shore towards her slip at Spring street, North river, she came in collision with the Pennsylvania Railroad ferryboat Chicago, which was crossing from

the Jersey side and was about entering her slip at the foot of Cortlandt street. The stem of the steamship struck the starboard side of the ferryboat a little aft of her paddle box about one-third of her length from the rear end and caused her to sink in a few minutes. Several of the passengers were drowned. The ferryboat was afterwards raised, but was not worth the cost of raising. Cross libels were filed by the owners of each vessel for their respective damages, to the amount of $100,000 for the loss of the Chicago, and $10,455.42 for the damages to the City of Augusta. Libels were filed for other damage claimants against the latter steamer for loss of life and for damages to property, to the amount of $187,888.27. The owners of each vessel thereupon filed petitions to limit their liability, each, however, denying fault on its own part and alleging the other vessel to be solely responsible for the collision. Answers were interposed and the causes have been brought on for trial together.

The City of Augusta, plying between New York and Savannah was a single-screw propeller about 302 feet long by 40 feet beam and 2,869 gross tons. The ferryboat was 205 feet long by 65 feet beam and of 1,000 gross tons. The Chicago left her slip on the Jersey side, which is a little further up river than the Cortlandt Street slip, New York, at 12:48 a. m. Her usual time in crossing from bridge to bridge is from 7 to 8 minutes, according to the tide. Her ordinary full speed would, therefore, be at the rate of about 7 to 8 knots. The City of Augusta after a detention of 11 minutes at quarantine, left there at 12:14 a. m. and was abreast of Castle Garden at 12:45; so that her full speed, making some allowance for time lost at the start in getting under full way, must have been about 12 knots against the tide. Her steam pressure was reduced in coming up, so that above Castle Garden her speed was probably about 10 knots. Her master estimates her distance from shore at Castle Garden at about 900 feet. It is his practice as he testifies, to give the order to slow on reaching Castle Garden; but on this occasion, observing the central ferryboat Fanwood coming across from her Jersey slip at Communipaw, which is half a mile below the Pennsylvania slip on the Jersey side, and approaching her slip at Liberty street, he continued on without slowing in order to pass ahead of her, giving to the Fanwood several signals of one whistle, indicating that he would pass ahead. The Fanwood, he says, answered his third signal, turned more up river, and allowed him to pass her about 200 feet distant off pier 8, whereupon he gave the order to slow. About a minute afterwards, as he says (page 164), he observed the Chicago approaching her slip, and gave her successively, as he testifies, at least three separate signals of one whistle, and kept on, intending to pass ahead of her as he had passed the Fanwood. He heard no signal or answer, as he testifies, from the Chicago though the Chicago gave him two whistles at about the same time. The pilot of the Fanwood testifies that he heard only one of these signals from the Augusta followed by an immediate alarm, to which the Chicago within one or two seconds replied with a signal of two blasts. All these signals were given, he says, when the Augusta was about off Liberty street or pier 14, which would be not over about 400 feet from the place of collision. The master of the Augusta says that

after his signals to the Chicago, he gave the order to stop his engine, but no order to reverse until his stem was within about 25 feet of her. The witnesses from the engine room state that the orders to slow, stop and back came very close together and almost as one. The entries in the engineer's log give the same time for all, namely 12:55, because as he says, they were only a fraction of a minute apart. This if correct, would indicate that the Augusta when she signaled and slowed was not over 500 feet below the place of collision, and that the Chicago's pilot may not have noticed the signal because he was preoccupied with giving his own signals and his endeavors to pass the Augusta's bow. He testifies that the lights of the steamer coming up near the shore and in the loom of the shore lights, were not seen or distinguished by him until the Chicago was within about 400 feet of the end of the piers, and the City of Augusta about the same distance below him in the river and about 175 feet nearer the piers; so that seeing it was impossible for him to avoid collision by stopping, he gave a jingle-bell for extra speed, hoping to pass ahead of the Augusta as the only chance of escape, and that he heard no signal from her.

When the Chicago was two-thirds past the Augusta, as above stated, she was struck at about right angles by the latter's stem, which penetrated her side about 12 feet. The force of the blow swung the stern of the Chicago, as well as the stem of the Augusta to the eastward until the port side of the Chicago near the after part of the paddle box, was shoved against the lower corner of Starin's pier (No. 13), which is the next pier north of the Cortlandt Street slip. The ebb tide then set the vessels a little down river, and the Chicago sank and rested upon the bottom in from 37 to 47 feet of water a few moments afterwards. As she lay upon the bottom her lower end headed a little towards the New York shore, being 40 feet inside of the line of the outer end of Starin's pier and 190 feet outside of the lower rack of the ferry and 90 feet below it; while her upper end was about 130 feet below Starin's pier and 60 feet outside of it.

There is considerable difference in the estimates of the different witnesses as to the distance of the collision from the New York shore. The master of the Augusta, claiming that she was heading straight towards the New York shore at the time when the Chicago had swung around so as to touch Starin's pier, concludes from that circumstance that at the moment of collision his vessel was 369 feet outside of Starin's pier, taking the length of the Augusta and the beam of the Chicago as guides. It cannot be assumed, however, that in swinging around, the Augusta's turning point would be at her stern; it would more probably be forward of the stern, and that would diminish the estimated distance. Other witnesses, moreover, including some from the Augusta, make her heading at the time the Chicago struck the pier only about 4 points towards the New York shore instead of 8 points; and had the heading of the Augusta been directly towards the New York shore by a swing of 8 points, the Chicago would also have been heading straight down river and would consequently have struck against the end of the pier instead of across the corner, as all the witnesses agree. If the angle was 4 points only, the swing of the

Augusta would also have been only about 4 points, which would reduce her distance at the time of the collision even according to the captain's method of computation, to about 280 feet. The pilot of the Chicago on the other hand, says that at the time of collision, the Chicago was within about 40 or 50 feet of Starin's pier. If two-thirds of the Chicago's length be added to that estimate, the Augusta's stem at the moment of collision would be about 180 feet outside of Starin's pier. The result of these comparisons is much nearer to a substantial agreement than usually happens in such cases, and it may be assumed without any such error as would be material for the purposes of this case, that at the time of collision the Augusta was between 200 and 300 feet outside of Starin's pier.

It seems to me impossible under the circumstances above stated to acquit either vessel of fault. The fault of the Chicago in not having seen the approach of the Augusta much earlier is clear and was not in fact contested on the trial. Though the effect of the electric lights from high buildings on shore doubtless increases the difficulty of distinguishing the lights of vessels coming up near the docks, it cannot be accepted as an excuse for not seeing a vessel with lights like the Augusta's, which must have been visible from the time the Chicago left her slip on the Jersey shore. There was nothing to obstruct the view. The lights were seen by the pilot of the Fanwood, which stopped and swung somewhat to the northward to let the Augusta pass ahead of her.

The testimony on the part of the Augusta's witnesses as to the time of observing the Chicago's green light, and also as regards not hearing the signal of two whistles given by the Chicago is so unsatisfactory, that the entries in the engineer's log and the testimony of her witnesses as to the very close signals given by the Augusta to slow, stop and reverse, and the evidence from the Fanwood satisfy me that the Chicago was not seen from the Augusta until she was very near, except possibly much earlier, when the Chicago was near the Jersey shore, after which no more attention was given her until too late. The testimony of the first officer who was forward with a seaman also on the lookout, who claims to have seen the Chicago from the time she left her Jersey slip, is inconsistent in different parts of the examination; and at all events no report of the Chicago's approach was made to the pilot house. The truth seems to be, that neither vessel was aware of the near approach of the other, until they were so near to each other that, at the speed they were going, neither master deemed himself able to stop in time to avoid collision. This is admitted on the part of the Chicago, and it is no doubt true as respects the City of Augusta, which on account of her delay in slowing must at that time have been going at the rate of from 8 to 10 knots. If the Chicago was seen some time before, watch of her was not kept up; so that the want of a sharp lookout was the common fault of both vessels.

Coming up so near to the piers as the Augusta undoubtedly did, it was her duty to be especially cautious and observant, particularly in respect to ferryboats, whether coming in or going out of their slips. This rule is specially enjoined by inspectors' rule 9, and it has long been laid down in the adjudications independent of statutory regula-

tions. The Relief, Olc. 104, 109, Fed. Cas. No. 11,693; The Favorita, 18 Wall. 601, 21 L. Ed. 856; The Breakwater, 155 U. S. 252, 262, 15 Sup. Ct. 99, 39 L. Ed. 139. Its necessity is manifest, not only in the daytime when traffic is busy, but also in the nighttime when the observation of lights near the shore is more likely to be confusing and when especially the attention of the pilots of ferryboats in endeavoring to make their slips in the strong tide, is necessarily much preoccupied with that duty. I must regard the Augusta as blamable for going so near the shore as she undoubtedly did at such considerable speed, when there was no necessity for either. In the space of a third of a mile from Chambers street down, there are four busy ferries. At Cortlandt street the Augusta was over a statute mile from her destination at Spring street. There was no good reason why she should not have kept further from the shore and come up astern both of the Fanwood and of the Chicago. For a steamer of the size of the City of Augusta to run at 7 or 8 knots speed within 300 feet of the ends of the piers, is a serious embarrassment to ferryboats in entering or leaving their slips; it adds materially to the dangers of navigation where there are so many ferries; and when this is unnecessary, it cannot be justified by any such alleged previous practice as is here claimed. The John S. Darcy (D. C.) 29 Fed. 644, 647; The Susquehanna (D. C.) 35 Fed. 325.

But what is more especially blamable in the navigation of the Augusta, was her failure to give any order to reverse until a few seconds before collision, and her keeping on at a speed which must have been about 8 knots until within 20 or 25 feet of the Chicago, as the master states (page 185, 186), which must have been only 2 or 3 seconds before collision. The bows of the Chicago at that time must have been nearly 150 feet past the stem of the Augusta. No doubt under the starboard hand rule, the Augusta had originally the right of way. She had the right to expect that the Chicago would take all necessary steps to avoid her and to count on her doing so as long as there was reasonable time and space to accomplish it. Had the Augusta reversed as soon as that point had been clearly passed by the Chicago, the Augusta must have been held without fault in that regard. But when it was obvious that the Chicago could not avoid collision by her own maneuvers, or when the Augusta had clear notice that the Chicago was going ahead of her, it became the Augusta's duty to reverse notwithstanding her previous right of way. Even the pilot Dow, called as an expert in behalf of the City of Augusta, did not put the space required for a full stop at less than $1\frac{1}{2}$ to 2 lengths, i. e. for the Chicago 300 or 400 feet. He thinks she could swing 8 points without forereaching over a length. This rests, however, on estimates only as to distances and not upon any verified measurements, and cannot, therefore, be trusted.

The Augusta failed to reverse when her duty to reverse became plain, since the Chicago when she was from 200 to 300 feet distant from the line of the Augusta's course was evidently intending to cross her bow. The Augusta was then probably about abreast of the Central Ferry slip. It was then self-evident that the Chicago, going at full speed could not possibly stop in time to let the Augusta pass

ahead of her without collision and that she was intending to pass ahead. The master of the Augusta states in effect that at that distance he recognized this fact (page 238). Besides this, moreover, no answer from the Chicago had been heard to repeated signals, as the master testifies, though there is no doubt that the Chicago did give to the Augusta a signal of two whistles, signifying that the Chicago would go ahead, the reason for such signal being, as her pilot stated, because he saw that it was impossible for him to avoid the Augusta by stopping, and that his only chance of escape was to run ahead of her. The witnesses from the Fanwood say the Augusta's position when she gave her signal to the Chicago, was off pier 14, which was only 450 feet from the place of collision. The witnesses from the Augusta testify that they did not hear the Chicago's signal given one or two seconds afterwards. It was heard, however, by at least two witnesses from the Fanwood, which was further from the Chicago than the Augusta was, and it is testified to also by several witnesses on the Chicago. There can be no doubt, therefore, that the signal was given. There is no reason why it should not have been heard, and attended to on the Augusta. That signal was also given at a time when the Augusta's witnesses claim that they were watching the Chicago,—when the Augusta was less than 500 feet from the point of collision; so that either that signal must be deemed heard on the Augusta, or else her pilot and lookout were not noticing her as they allege; and in either case not heeding or noticing her must be set down to the Augusta's own fault. The New York, 175 U. S. 187, 20 Sup. Ct. 67, Adv. S. U. S. 67, 44 L. Ed. ——.

All the circumstances indicate that the near presence of the Chicago came as a sudden surprise, through previous inattention to her. The Augusta is clearly chargeable with notice of the intent of the Chicago to go ahead of her, if not by her signal, certainly by her position and speed, from the time when the Chicago was over 200 feet outside of the line of the Augusta's course. After that she ran at least 350 feet before collision, and the Augusta ran as much or more, occupying about half a minute. Had the order to reverse been given by the Augusta when the Chicago was even a length to port, instead of waiting until the Chicago had passed over 100 feet beyond her stem, I have not the least doubt that the approach of the Augusta would have been delayed much more than the few seconds necessary to enable the Chicago to run 75 or 100 feet further, i. e. about 10 seconds, and thus to have cleared the Augusta and avoided this disaster.

Rules 3, 6, and 9 of the board of supervising inspectors impose the duty to reverse upon the City of Augusta, as well as the duty to blow timely signals when the vessels approached within half a mile of each other. It is unnecessary to refer to other authorities than the recent cases of The New York, 175 U. S. 187, 201, 20 Sup. Ct. 67, Adv. S. U. S. 67, 44 L. Ed. ——, and The Albert Dumois, 177 U. S. 240, 253, 20 Sup. Ct. 595, Adv. S. U. S. 595, 44 L. Ed. ——, and the other cases there cited, as regards the force of those rules and the obligation to hold in fault vessels that run into collision by disregarding them. The faults of the City of Augusta are mainly the same as those of The New York in the case above cited (175 U. S. 209, 20 Sup. Ct. 67, Adv.

S. U. S. 67, 44 L. Ed. ——), to which is to be added her unnecessary navigation at considerable speed so near the piers in the region of so many ferries.

It is urged in behalf of the City of Augusta that at the time when the Chicago had approached within 200 or 300 feet of the place of collision, the Augusta was in extremis, and that no error in the master in not immediately reversing should be deemed a fault. Assuming that both vessels were at that moment in extremis, this defense does not avail either of them, since there were abundant means of observation, before, and the situation was brought about by the several prior faults of the City of Augusta, as well as by the faults of the Chicago. The Elizabeth Jones, 112 U. S. 514, 5 Sup. Ct. 468, 28 L. Ed. 812.

Both vessels must, therefore, be held to blame, and the owners equally liable to answer for the loss and damage caused by the collision, subject to the limitation of their liability to the value of the vessels, to which I find the owners entitled.

Upon the evidence submitted upon the claim for loss of life, I allow under the statute of this state:

To Jane Bryson, administratrix of John Bryson, a driver 50 years old, who was drowned, for the benefit of his widow and next of kin, the sum of $5,000.

To Mary E. Weir, administratrix of Alexander Weir, a retail coal dealer, aged 30, also drowned, the sum of $7,500.

To Elizabeth Macready, administratrix of Charles Z. Macready, aged 27, a milk driver and decorator, also drowned, the sum of $7,500.

The proofs as to the other damage claims may be taken before a commissioner in case the parties interested do not agree.