### THE FAVORITA.

1. A large ocean steamer, running at the rate of eight or ten miles an hour, and close in with the Brooklyn shore, on the East River, and across the mouths of the ferry slips there, in order to get the benefit of the eddy, condemned for a collision with a New York ferry-boat coming out of her dock on the Brooklyn side, and which, owing to vessels in the harbor, did not see the ocean steamer.

2. Demurrage charged also against the ocean steamer for the time that the ferry-boat was repairing, though her owners, a ferry company, had a spare boat which took her place on the ferry.

APPEAL from the Circuit Court for the Eastern District of New York; this being the case:

Among the numerous ferries between Brooklyn and New York is that known (from the name of its New York dock) as the Catharine Street Ferry. The dock on the Brooklyn side is at Main Street, not opposite to Catharine Street, but considerably to the east of it; so that all ferry-boats coming out of it and on their way to the Catharine Street dock on the New York side have, after getting out of their dock, to turn considerably to the westward, and so run over to New York. To the west of Main Street the Brooklyn shore projects somewhat and then falls off towards the south.

On the afternoon of April 14th, 1865, the Manhassett, a ferry-boat belonging to the Union Ferry Company, a company having several other ferries between New York and Brooklyn, was coming out of her dock at Main Street, on

one of her regular trips.   A good deal of shipping was lying at anchor outside and to the southwest of the dock, in a way that intercepted the view westward by a boat coming out.

At the same time that the Manhassett was thus coming out of her dock, the ocean steamship Favorita was coming *up* the river (eastwardly or northeastwardly), and with a view of getting or keeping the eddy was running, as this court assumed on the weight of the evidence, " close in with the Brooklyn shore and across the mouths of the ferry slips," which line it.

A statute of New York makes it obligatory on all vessels passing up or down this part of the river to keep the centre and to move slowly.   The Favorita was not at her full speed at all, but was still running at the rate of eight or ten miles an hour.

The pilot of the Manhassett, on account of the shipping lying adjacent to the pier, and perhaps in part from the curve in the shore, was unable to see the Favorita until he had passed out of the slip.   As soon as this was done, and the vision to the southwest was unobstructed, he discovered the Favorita coming up the river within such close proximity to the Brooklyn side as to render the danger of collision imminent.   Acting on the exigency of the moment, he rang his bell to stop, then to back, and blew two whistles, indicating to the Favorita his wish that she should sheer to the New York shore, and endeavored by a pressing signal to his engineer " to back her strong," so as to get his boat again into her slip.   The Favorita, if she heard the whistles, did not respond to them, and if she changed her course at all it was in the direction opposite to that called for by the signal.   A collision ensued; the Manhassett was struck forward of her port wheel-house, and suffered material injury.

The owners of the ferry-boat put another boat, which they owned, on the ferry, and sent the Manhassett for repairs. These it took ten days to make.   They then libelled the Favorita for damages.

A good deal of testimony was taken, and it conflicted in

certain parts, including especially ·that as to .whether the Manhassett had executed the proper manœuvres when she saw her peril—that is to say, whether she ought not to have gone straight on—and as to what the distance was at which the Favorita was running from the Brooklyn shore. The court, as already said, assumed that the Favorita was running " close to the Brooklyn shore and across the mouths of the ferry slips."

The District Court decided that both boats were in fault, and apportioned the damages, while the Circuit Court, imputing no fault to the Manhassett, fixed the blame on the Favorita alone, and decreed accordingly, and decreed also a certain sum, based upon the evidence, for demurrage. From that decree the present appeal was taken.

*Mr. R. D. Benedict, for the appellant; Mr. B. D. Silliman, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

It is not necessary for the proper disposition ·of this case to reconcile conflicting testimony, as is frequently required in causes of collision. It is true the witnesses differ in opinion on the question whether the Manhassett pursued the proper course when threatened with danger, and also in the matter of distances, but these differences do not affect the main points on which we rest our decision.

It is manifest, on account of the extent of the shipping constantly passing through the East River at this point of it, that the greatest vigilance is required in the navigation of the stream by vessels passing up or down it. More especially is this so by reason of the constant passage of ferry-boats across the river. The extent of this business can hardly be overstated. Millions of passengers are ·transported between Brooklyn and New York annually, and, of necessity, the boats must make their trips with regularity by night as well as by day, and in all kinds of weather. All persons who seek the waters of this river must observe the rules which tend to the safety of navigation. This ob·

servance involves no hardship, and does not assert any ex-
clusive or prior right in behalf of ferry-boats. It is neces-
sary for the protection of all the different interests centring
in this great harbor, and these interests are all to be recog-
nized and considered in determining what is or is not good
navigation under the circumstances. Manifestly the rules
of navigation must vary according to the exigencies of busi-
ness and the wants of the public. The rule which would be
applicable in a harbor where the business was light and the
passage of vessels not liable to be impeded, would be inap-
plicable in a great thoroughfare like the East River. In the
former it might be that vessels could with safety run across
the mouths of ferry slips in going to or from their wharves,
while in the latter such navigation would necessarily be
hazardous. It is hazardous, because ferry-boats are con-
stantly emerging from their slips, and their masters gener-
ally unable, on account of the shipping moored about the
piers, to discover approaching vessels until they have got
their boats out into the open river. Common prudence,
therefore, requires that vessels in the situation of the Fa-
vorita should occupy as near as possible the middle of the
river. This is necessary for the mutual safety of all con-
cerned in its navigation, and is required for the protection
of life as well as property. If the middle of the river be
previously occupied, and the ship is obliged to go nearer to
shore in order to avoid other vessels pursuing the same
track, she must run at such a slow rate of speed as to be
easily stopped, so as not to endanger boats pursuing their
regular and accustomed occupation. Any other rule than
this would tend to the confusion rather than the safety of
navigation, and put in jeopardy the lives of hundreds of
people. The great and varied business interests conducted
in this harbor require the rigid enforcement of this rule.
Indeed, the necessity for it was so apparent that the legisla-
ture of New York, doubtless in order to render it more
effective, embodied it in a statute. The Favorita, without
excuse, violated this rule. It is plain from all the evidence
that her object in going where she did was to seek and

keep the eddy. This may have made her navigation easier, but she cannot escape in this way, for there was no difficulty in running the boat out in the river, and the excuse that she went close in shore to avoid other vessels is not sustained by the evidence. There were no more vessels than usual in the river at the time, and no reason given why a departure from the usual path was necessary under the circumstances. Besides, suppose there was, the Favorita is condemned by her rate of speed. If she was placed in the predicament which compelled her to take the shore track, obviously her speed should have been lowered, so that the boat could have been readily stopped, and on a moment's warning changed to the right or left, as the necessities of the case may have required. It may be that in the middle of the river she could have been safely run at eight or ten miles an hour (a point on which we express no opinion), but clearly, running along across the pier ends and ferry slips of the East River at such a rate of speed is at all times dangerous, and the result proves that it was particularly so at this time.

There is a good deal of testimony bearing on the point of the distance of the Favorita from the shore at the time of the collision, but it is unnecessary to consider it, for the estimate of witnesses in times of sudden peril on such a subject is mere conjecture, and necessarily inconclusive. That the ship was out of the path she should have occupied, and improperly close to the Brooklyn shore, is evident enough, because both vessels were in perilous proximity the moment the Manhassett emerged from her slip. Had she been at a suitable distance from the shore, or going with a materially lessened speed, the collision would not have happened, and the inquiry arises whether she must alone suffer for the loss that occurred. On a consideration of the whole evidence we are unable to see in what respect blame can be cast on the Manhassett.

It is clear that the officers of the Manhassett did not see the Favorita, on account of intervening vessels, until the former had emerged from her slip, and equally clear that

they had no right to expect the Favorita to be in the wrong place in the river. The peril was imminent as soon as the Manhassett had cleared her slip, and both vessels were in full view of each other. Both at once applied the means and took the course deemed proper by their officers to prevent the catastrophe. It is said if the Manhassett had advanced instead of stopping she would have cleared the steamship. This may or may not be true, but if true, she is not in fault for this error of judgment. It was a question whether to advance or to stop and back, and the emergency was so great that there was no time to deliberate upon the choice of modes of escape. In such a moment of sudden danger, caused by the misconduct of the Favorita, the law will not hold the pilot of the Manhassett, acting in good faith, guilty of a fault, if it should turn out after the event that he chose the wrong means to avoid the collision, unless his seamanship was clearly unskilful. And this we do not find to be the case. On the contrary, if there were error at all, it was such a mistake of judgment as would likely be committed by any one in similar peril. If the Favorita had been where good navigation required her to be, or had she slackened her speed so as to be able to stop as soon as she discovered the Manhassett, the danger would not have existed, nor the accident happened. She is, therefore, in our opinion, chargeable with all the consequences that flow from this collision.

The appellants object to the allowance of demurrage by the commissioner on the ground that the ferry company suffered nothing by the loss of the use of the Manhassett while undergoing repairs, because her place was supplied by a spare boat kept for emergencies, and which would otherwise have been idle. This subject was fully discussed in the case of *The Cayuga** by the learned circuit judge of the second circuit, who sustained a similar allowance, and as that case was affirmed on argument in this court,† and

---

* 7 Blatchford, 385.                    † 14 Wallace, 278.

his views adopted, we must consider the question as no longer open to discussion.

DECREE AFFIRMED.