PUBLICOVER et al. v. ALCOA S. S. CO., Inc., et al.

ALCOA S. S. CO., Inc. v. PUBLICOVER et al.

No. 251, Docket 20961.

Circuit Court of Appeals, Second Circuit.

May 25, 1948.

Robert S. Erskine, and Kirlin, Campbell, Hickox & Keating, all of New York City (John F. Gerity, of New York City, of counsel), for appellant.

Chauncey I. Clark, and Burlingham, Veeder, Clark & Hupper, all of New York City (Charles E. Wythe, and C. B. Manley O'Kelley, both of New York City, of counsel), for appellee Publicover et al.

John W. Griffin, and Haight, Griffin, Deming & Gardner, of New York City (James McKown, Jr., and MacDonald Deming, both of New York City, of counsel), for S.S. Rita and Royal Norwegian Government.

Richard F. Shaw, of New York City, for claimant-appellee, Western Union Telegraph Co.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The Alcoa Steamship Company, Inc., appeals from a decree in the admiralty, holding its ship, the "Alcoa Pilot," solely liable for a collision on the high seas, between herself and the four-masted schooner, "Lillian E. Kerr," owned by the libellants, Publicover and others, in which the schoner was sunk. The "Alcoa Pilot" was bound for New York through the Cape Cod Canal, in a convoy of four columns abreast of two ships each, the columns being 1800 feet apart and the second ship in each column 1200 feet behind the first; the "Alcoa Pilot" was the first ship in the port column. The collision was about seventy-five miles a little north of east from the tip of Cape Cod; it happened shortly after midnight on November 13, 1942. The weather was clear save for a bank of clouds to the west of the convoy, which was headed 260° true. There were three or perhaps four Canadian corvettes in attendance but their position at the time of the collision does not appear in the record, and they played no part in the result; and the "Alcoa Pilot" asserts that, had they done their duty, they would have prevented the collision. The wind was light, and out of the west; the "Kerr," which was bound to Halifax from New York with a cargo of coal, was on the port tack, all sails set, when the bluff of her starboard bow collided with the port bow of the "Alcoa Pilot" at an angle of about 90°. She slid along the port side of the steamer, her masts and sails falling, and sank astern within six or seven minutes with six of her crew of seven men. The survivor died, soon after he had been picked up by another vessel of the convoy.

Publicover arrested the "Alcoa Pilot." Her owner, Alcoa Steamship Company, Inc., impleaded the steamship "Rita," the second ship in her column; and the "Cyrus Field," the first ship in the column to starboard; and filed a libel against Publicover and the other owners of the "Kerr," and against the Western Union Telegraph Company, owner of the "Cyrus Field." It charged against the "Rita" that, although she passed so close to the "Kerr" that she must have seen the schooner in a sinking condition, she made no effort to rescue any of the crew. It charged against the "Cyrus Field" that her master, Delap, was the "commodore" of the convoy, and that he and his chief officer, Wright, who was on watch at the time, did not give the proper directions after the light of the "Kerr" became visible. Judge Goddard's opinion[1] contains a summary of the testimony (substantially all of which was taken by deposition), which we shall not repeat, and with which we shall assume familiarity in the following discussion.

We hold the "Alcoa Pilot" at fault on two counts, either of which condemns her: (1) Her failure to take action of any kind in season, and (2) taking the wrong action when she did act. As we said in Lind v. United States,[2] "all navigation rules presuppose" that each vessel shall be able to make out the other's course and speed, and they cannot be rigorously imposed when, as here, one of the two was completely blacked out. The case was one of "special circumstances,"[3] although it does not follow that the rules were in all respects in suspense. The "Alcoa Pilot's" story of what led up to the collision is that she made out a white light about two points off her port bow shortly or immediately after Shoberg, her second officer, came on watch at midnight. The master, Perry, was asleep at the time and Shoberg was in command until almost the moment of collision. He was on the upper bridge and was uncertain what the light was. He thought it might be on one of the corvettes, whose duty was to keep in advance of the convoy, clearing away vessels that might be in its path, and in general protecting it against enemy action; it might be the stern light of a merchant vessel; possibly it was an enemy decoy. In any event he and Franz—the lookout on the bridge who was charged with watching from the port bow to the port beam—closely watched the light for the next fourteen to sixteen minutes. Since the speed of the convoy was six and a half knots and the "Alcoa Pilot" kept her speed, the distance she travelled in that time was

---

[1] The Lillian E. Kerr., D.C., 71 F. Supp. 184.

[2] 2 Cir., 156 F.2d 231.
[3] § 112, Title 33 U.S.C.A.

between 9100 and 10,400 feet. Meanwhile the bearing of the light grew a little finer until it bore only about one point on the "Alcoa Pilot's" bow, when of a sudden it seemed to change to green and the need for some action arose.

This story is contradicted by the deposition of Wright, who was in command on the "Cyrus Field." He saw the light from the bridge for about eleven minutes before the collision, and he took two compass bearings: one of these was 242°, taken when he first made out the light, and the second was 235°, taken about six minutes later. (Since these were both compass bearings they needed no correcting for his own change of course meanwhile from 260° to 270°.) These readings are more reliable than those of the "Alcoa Pilot" for several reasons. In the first place they come from a more disinterested source, and in the second they place the schooner nearer to the course of the convoy, which, as will appear, was more likely. We assume that the four leading ships substantially kept their line so that, eleven minutes before collision the "Cyrus Field" was about 7200 feet from a line drawn across their bows at the time of collision. Apparently the "Alcoa Pilot" had closed in somewhat upon the "Cyrus Field" so that the distance between them was less than 1800; Shoberg thought that it had been reduced to about 1200, although it must have begun to widen when the "Cyrus Field" changed her heading to 270°. Be that as it may, even though the "Alcoa Pilot" was only 1200 feet to port of the "Cyrus Field" when the "Cyrus Field" was say 7200 feet from the position of the leading ships at the time of collision, if the light then bore 242° by compass from the "Cyrus Field," it could not have borne even a full point on the "Alcoa Pilot's" bow, probably not more than half a point. In proportion as the distance between the two ships was greater than 1200 feet, the light bore finer on the "Alcoa Pilot's" bows, and in consequence was more nearly constant as she advanced.

Shoberg became increasingly concerned as he got closer; but he assumed, as was the fact, that the "Cyrus Field" had also seen the light, and he thought that any in-

itiative lay with the commodore. To use his own words, he "was waiting for the commodore to take action, and judging if it turned out to be a steamer, then if I had taken any action I would have been wrong, if I took it individually before, and the ship being on the right hand I couldn't take any action there." Again: "I expected if I put my lights on he could see my lights, and even if" (there was?) "immediate danger I could take action." It is clear that the only defence for this inaction is that he was justified in relying upon the commodore. He knew that his ship was blacked out, the "risk of collision" had long been obvious, he alone was in a position to take any effective action to avoid collision. He knew that he was overtaking what might be a stern light, that it was, not only fine on his bow, but not changing fast, and that, so far as it did change, it was growing finer, a sure indication that to avoid collision, it must cross his bows if he kept on. In such a position to keep his course and speed until he was within two minutes of collision, was utterly inexcusable if the responsibility for the "Alcoa Pilot" rested upon him.

In the earlier stages of the litigation it was impossible to get access to the regulations which governed convoys during the war, and a good deal of testimony was taken about them which appears in the depositions. Later, however, need for secrecy disappeared, and the Navy gave a series of answers which cover the whole subject adequately and make immaterial most, if not all, of the testimony. These answers are too long to quote in full; but a few of the most important will serve. For example: "If you are forced out of position by another ship to avoid collision, you may use full rudder and increase or decrease speed. The moment that danger of collision has ceased you should come to convoy course and speed * * *" Again: "Although the Commodore is responsible for the safe conduct and cruising order of a convoy, it is emphasized that Masters of merchant ships are not thereby absolved from their responsibility for the safety of their ships at all times." Lights were "only to be exhibited (a) For avoiding collision, in which case they are to be extin-

guished as soon as the danger of collision has passed." The use of sound signals was contemplated. Nothing supported the inference that responsibility for the navigation of individual ships in an emergency devolved only upon the commodore, although he did of course have command of the convoy's movements as a unit. It is apparent that Wright so understood, for he changed his course ten degrees to starboard to give the "Alcoa Pilot" a wider berth in which to avoid the light—proving that he thought the occasion would call upon her for independent action. There are passages in the testimony of Delap, Perry, and several others in the convoy, given, as we have said, before the regulations became available, which do indeed give some color to the notion that changes of course by any individual ship, as well as by the convoy as a whole, must await an order of the commodore although, even in these the witnesses nearly always limited their answers to situations in which there was no "immediate danger." We need not consider how well they match with the regulations, for obviously these alone are authoritative; and they are plain.

Be all this as it may, whatever can be said in defense of what Shoberg did not do before the white light changed to green, we can see no excuse for what he did thereafter. Even then, he did not realize that he was faced with a critical emergency, as this passage from his deposition proves: "it turned out to be a green light. I still judged there was no immediate danger, I couldn't see the outline of the ship, and I judged I could see about half a mile." What he did was consonant with this estimate that there was "no immediate danger"; for, instead of at once ordering a hard right rudder, he went down from the upper bridge, thus leaving no one in charge of the ship, turned on the lights himself, roused Perry, the master, and went back to the upper bridge. How long all this took it is impossible to say. He estimated that a minute had elapsed before he got back, and that appears to be conservative; he also estimated that the collision took place a minute after the rudder was put hard right.

Accepting these intervals as accurate, it can be almost demonstrated that what caused the disaster was his leaving the bridge to snap on the lights. The "Alcoa Pilot" was 400 feet long and she was moving at 650 feet a minute; under a hard-over helm Knight's[4] "turning circles" show that in one minute, although her heading would have changed about two points to starboard, the bluff of her port bow would not have left her course; and she would have done nothing to avoid collision. If, however, she had been under a hard-over helm for two minutes, her position would have been totally different; her heading would have changed three and a half points or more, and even her stern would have left her course. There would probably have been no collision whatever; and at most the schooner would have carried away only her bowsprit, jibs and perhaps her foregear.

■ It is idle to put this down as an error in extremis; it was the result of Shoberg's mistake in thinking that there was "no immediate danger" because he could not "see the outline" of the schooner; to say nothing of the fact that the emergency was not forced upon him by any fault of the schooner, as we shall show later. However, even though we were to accept the decision as one made in extremis, nothing forced him to choose between a hard-over rudder and snapping on his lights; the two were not inconsistent. An order to the quartermaster, who incidentally had already been surprised that none had come, would not have taken five seconds; and would not have in the least have interfered with any effect he got from the lights. We repeat, his mistake was not because he was in panic, but because he utterly misunderstood the danger. It is somewhat faintly suggested that a hard right rudder would have brought him too near the "Cyrus Field"; but there was no such danger. Indeed, that is just what in the end he did do with entire safety. He had at least three ship lengths to starboard, which gave him ample berth to right himself. We are urged to yield our own judgment to that of this seasoned master who was on the spot and

---

4 Knight, Modern Seamanship, 8th Edition, p. 327.

whom our experience does not fit us to condemn. If we had resort to Trinity Masters, we should indeed welcome their help; but unhappily we have not, and, thrown back upon our own resources, we must decide as best we can.

The "Alcoa Pilot" charges the schooner with keeping a faulty lookout, on the assumption that if she had had a proper one, she would have seen that she was being overtaken. That is a strangely baseless assertion. She carried a green light, and presumably a red light, though it would have made no difference if she had not; and the white light was undoubtedly the stern light which the statute requires:[5] i. e. throwing light six points "from right aft on each side of the vessel," and at the same height as the sailing lights. That would exactly account for the manner in which those in the convoy saw it merge, as it were, into a green light. Being protected, as the law required, she was free to assume that any vessel approaching from more than two points abaft her beam would keep out of her way, so much at least of the sailing rules were not suspended by the blackout.[6] As she was, she was under no duty to keep any lookout astern;[7] although, it is true, there may be occasions when a stern lookout is required, as when a vessel is backing,[8] or when she is relying upon a flare instead of upon a stern light. It is possible indeed that she had begun to pay off to leeward just before the collision; that was Wright's conclusion and there was something to support it. The airs had been very light until a short time before, and it is certainly not unlikely that she had lost her steerage way and, being in the doldrums, had substantially changed her heading, heavily laden as she was. That would account for her being headed about four points off her course when she was struck. It would also account for the fact that she was always so fine on the "Alcoa Pilot's" bow, for it would substantially eliminate her speed. True, the emergence of the green light out of the white is equally understandable by the fact that the "Alcoa Pilot" had come less than two points abaft her beam, but we are assuming any doubts against her. It would have made no difference if she was paying off to get on her course, for an overtaken vessel is not bound to keep her course; she may rely upon any overtaking vessel to give her berth enough to accommodate itself to any such change.[9] There may indeed come a moment when the overtaken vessel will be frozen to her course, but that is only after she sees that the overtaking vessel is not going to do her duty; and no lookout is required to anticipate that this will happen. Thus, the schooner would have been altogether justified in relying upon the fact that, lighted as she was, any overtaking vessel would give her an adequate berth for that purpose.

We can dispose of the charges against the "Rita" summarily. The Stand-By Act[10] applies only to a vessel which has collided with another, as the "Rita" had not; and indeed it is not under that act that the "Alcoa Pilot" seeks to hold her; but because the "Rita" failed "to perform the special wartime duties imposed upon her by convoy regulations." Those regulations were express; they imposed upon the rear ships of a column in a convoy only the duty to "proceed to the assistance of any vessel in their respective columns which may be damaged by normal marine risk"; and the "Rita" owed no duty to the schooner, or to any other ship but the "Alcoa Pilot" herself. We are of course not speaking of moral duties, or even of a master's legal duties; but of those which charge an owner, which are often quite different. For instance, our statute in implementation of the International Salvage Treaty[11] does

[5] § 80, Title 33 U.S.C.A.

[6] § 109, Title 33 U.S.C.A.

[7] The Holly Park, 2 Cir., 39 F.2d 572; The Greystoke Castle, D.C., N.D.Cal., 199 F. 521; Dalzell v. United States, D. C., E.D.N.Y., 60 F.2d 1068.

[8] The Herbert L. Pontin, 2 Cir., 50 F. 2d 177.

[9] The Industry, 2 Cir., 29 F.2d 29; The Holly Park, supra, 2 Cir., 39 F.2d 572; The Syosset, 2 Cir., 71 F.2d 666; The S. & H. No. 2, Inc., 2 Cir., 119 F.2d 666.

[10] §§ 367, 368, Title 33 U.S.C.A.

[11] § 728, Title 46 U.S.C.A.

not impose liability upon the owner for his master's failure to conform to the duty imposed upon him.[12] The suggestion that the "Rita" actually ran down the schooner—gave her her "coup de grace"—does not deserve an answer.

The charge against the "Cyrus Field" is that, when Wright told Delap that the light had broadened from 242° to 235°, he did not add that he himself had changed the ship's own course from 260° to 270°. First, this change of course had nothing to do with the bearing of the light from the north, which was what Wright's information was. Second, any failure of Delap to do his duty would not charge the "Cyrus Field," as the "Alcoa Pilot" herself concedes. The owner of the "Cyrus Field" did not make Delap commodore; those duties were imposed upon him in invitum. Nor would it charge the ship, if Wright had misinformed him; for that was incidental only to his duty as commodore; and no neglect of it could be imputed to the owner. Finally, even though we were to press the liability of the "Cyrus Field" as a fictitious jural person, she was not at fault; she did not contribute to the collision. The hypothesis is that it was the failure of the commodore to take charge of the "Alcoa Pilot's" navigation which was the fault.

The only remaining question is the refusal of another judge at an earlier stage of the litigation to require Publicover to answer certain interrogatories, designed to learn whether the Dominion of Canada had made payments "in the nature of pensions or otherwise" to the representatives of the schooner's crew who were killed. We surmise that the purpose of this was to show that the Dominion was a party in interest, and that the corvettes had been in whole or in part responsible for the catastrophe. We need not say that the interrogatories should have been answered when they were propounded; but we do hold that they must now be answered, and the commissioner is directed not to proceed in the cause until they have been.

Decree affirmed.

---

[12] Warshauer v. Lloyd Sabaudo S. A., 2 Cir., 71 F.2d 146.