**NATIONAL BULK CARRIERS, Inc., v. UNITED STATES of America et al.**

No. 219, Docket 21631.

United States Court of Appeals Second Circuit.

Argued May 4, 1950.

Decided June 23, 1950.

Writ of Certiorari Denied Oct. 23, 1950.

See 71 S.Ct. 89.

---

406

Burlingham, Veeder, Clark & Hupper, New York City, Proctors for Rutgers Victory, Burns Steamship Company and the United States, appellants, Chauncey I. Clark, Adrian J. O'Kane, New York City, Counsel.

Barry, Wainwright, Thacher & Symmers, New York City, Proctors for National Bulk Carriers, Inc., owner of Tank Steamship Nashbulk, John C. Prizer, Carter H. Yates, New York City, Advocates.

Before L. HAND, Chief Judge, and CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

A collision which occurred on September 27, 1946, between the steamship Nashbulk, owned by National Bulk Carriers, Inc., and the Rutgers Victory, owned by the United States and bare-boat chartered to Burns Steamship Co., led to this suit. It happened on the high seas in mid-afternoon about 225 miles southeast of New York, when the sea was calm, the weather clear, and the visibility good.

The Nashbulk, a tanker 542.6 feet long, of 14164 gross tons, with an 80.2 feet beam, 40.1 feet moulded depth and a 31' 7" draft, was bound from Venezuela to Portland, Maine, with a cargo of petroleum products in bulk. She was built in 1945 and was powered by two Westinghouse double reduction steam turbines geared to a single shaft.

The Rutgers Victory, a steamship 439.1 feet long, of 7607 gross tons, with a 62.1 feet beam, 34.5 feet moulded depth, and a 28' 5¾" draft, was bound from Philadel-

phia to Antwerp with a cargo of coal. She also was built in 1945 and was powered by two General Electric steam turbines geared to a single shaft.

Just before 4:00 P.M.[1] the Rutgers Victory, proceeding on a course of 80° true at a speed of 14½ knots, was sighted by the Nashbulk, which was on a course 356° true and making 16 knots, about seven or eight miles away, four points on the Nashbulk's port bow. When the bearing of the Rutgers Victory remained constant, the Nashbulk's chief mate at 4:15 P.M., changed from telemotor to manual steering, in accordance with the Nashbulk's master's standing orders to use manual steering when near other vessels or land. At 4:25 P.M., when the ships were about two miles apart, the Nashbulk's chief mate called the master and told him of the approaching vessel, whose bearing continued to be the same, and the master and mate of the Nashbulk kept the Rutgers Victory under observation until after the collision occurred. Until 4:32 P.M., when the vessels were about one-half a mile apart, the Nashbulk kept her course and speed. Then, however, her master, without sounding his whistle, ordered his engines slow ahead and his rudder hard right which caused his vessel to go off three to four points. At about 4:33 P.M., he ordered his engines full speed astern and about ten seconds later blew a three-blast signal.

The Rutgers Victory, meanwhile, had had no lookout; her watch officer had left the bridge and was working at a desk in the rear of the wheelhouse. At no time until immediately before the collision did she sight the Nashbulk but she continued on without change of course or speed until she heard the Nashbulk's three blast signal at about 4:33. Her watch officer then went on the bridge and ordered a hard left rudder. The rudder had just begun to take hold when he ordered it hard right a few seconds before the collision which occurred in about half a minute after 4:33, the Nashbulk's port bow striking the starboard side of the Rutgers Victory about 175 feet from the latter's stern, at about a 45° angle.

Both vessels were damaged and some of the Rutgers Victory's cargo was lost. On October 28, 1946, the owner of the Nashbulk sued the owner and charterer of the Rutgers Victory. On November 7, 1946, the charterer filed a cross-libel against the Nashbulk and her owner. The District Court held the Rutgers Victory solely at fault and the United States and the charterer have both appealed.

There is not the slightest doubt that the Rutgers Victory was glaringly at fault. She had no lookout, in violation of Article 29, 33 U.S.C.A. § 121. In a crossing situation, she had the Nashbulk on her starboard hand and thus was bound to keep out of the way, Article 9, 33 U.S.C.A. § 104; to avoid crossing ahead of the Nashbulk, Article 22, 33 U.S.C.A. § 107; and to slacken her speed or stop or reverse, Article 23, 33 U.S.C.A. § 108. She did none of these things, but maintained her course and speed until collision was unavoidable.

The appellants claim, however, that the Nashbulk also was at fault, both for her navigation and for her failure to blow a one-blast signal upon going hard right at 4:32, a minute and one-half before the collision and when the ships were about one half mile apart.

We agree with the court below that, the Nashbulk's failure to sound her whistle aside, her navigation was not faulty. As the privileged vessel on a crossing course which had no reason to believe that the burdened vessel would fail in her duty, she was bound to keep her course and speed until such time as she found herself so close that collision could not be avoided by the action of the Rutgers Victory alone. The Delaware, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771. See Article 21, 33 U.S.C.A. § 106; Article 27, 33 U.S.C.A. § 112, Article 29, 33 U.S.C.A. § 121. Though it was when the vessels were still about one half a mile apart that the Nashbulk went hard right and reduced her speed to half forward, appellants introduced expert testimony to the effect that she should have acted more promptly, i. e., when the vessels were between 3500 and 4000 feet apart,

I. All times referred to herein are Eastern Standard time.

and insist that she also should have gone full speed astern instead of reducing her speed only one-half when she did first take action. But such criticism, based largely upon hindsight, seems to presuppose that the Rutgers Victory could not then have been expected to navigate as the situation required. In order to make good their argument with respect to the Nashbulk's failure to sound her whistle upon going hard right, they necessarily take the position that at that time the Rutgers Victory could have successfully taken action to prevent collision and we agree. In view of the extremely difficult circumstances forced upon him by the Rutgers Victory's blind sailing, no good reason has been shown why the district judge's finding that the master exercised good judgment in navigating as he did should be disturbed. Wilson v. Pacific Mail S. S. Co., 276 U.S. 454, 461–462, 48 S.Ct. 369, 72 L.Ed. 651.

Whether the Nashbulk should be held for her failure to sound a one-blast signal when she went hard right at 4:32 P.M. is another matter. Article 28, 33 U.S.C.A. Sec. 113 provides that "When vessels are in sight of one another, a steam vessel under way, in taking any course authorized or required by these rules, shall indicate that course by the following signals on her whistle or siren, namely: One short blast to mean, 'I am directing my course to starboard.' * * * "

■ Appellee argues, and the court below held, that the Nashbulk's turn to the right was not a change of "course" within the rule, but was merely a change of "heading." Cf. Clyde-Mallory Lines v. New York Cent. R. Co., 2 Cir., 83 F.2d 158, 159; Commonwealth & Dominion Line v. United States, 2 Cir., 20 F.2d 729, reversed on other grounds 278 U.S. 427, 49 S.Ct. 183, 73 L.Ed. 439. The cases relied upon, however, are winding channel cases, not applicable here. On the high seas, a change of heading of eight degrees has been held a change of course. Socony Vacuum Transp. Co. v. Gypsum Packet Co., 2 Cir., 153 F.2d 773. We hold that in going off three to four points the Nashbulk was "directing" her "course to starboard" within the rule.

■ Appellee does not now seriously, nor could it plausibly, press upon us as justification for the master's failure to sound a one-blast signal, his explanation made at the trial that he did not do so for fear of giving rise to confusion and starting the Rutgers Victory "on some unprudent course which would make the situation more serious." The Rules do not admit of violation for fear of causing confusion. Cf. A. H. Bull Steamship Co. v. United States, 2 Cir., 34 F.2d 614. Nor can we agree with the contention, which the district judge upheld, that the Nashbulk was in extremis when she starboarded without signaling. That was at the time when she was released from her obligation to hold her course and speed by the failure of the Rutgers Victory to take, as the burdened vessel, timely action to comply with the starboard hand rule. By hypothesis, no sudden emergency had arisen and it was when by prompt cooperation the Rutgers Victory could, with the aid thus given by the Nashbulk, have avoided the collision. These assumptions are not only necessary to justify the Nashbulk's change of course and to absolve her from violating the starboard hand rule in so doing but they are probabilities in accord with the evidence and negative the contention that the Nashbulk was then in extremis. Only when an emergency suddenly arises does the in extremis doctrine apply. The Favorita, 18 Wall. 598, 603, 85 U.S. 598, 603, 21 L.Ed. 856; Publicover v. Alcoa S. S. Co., 2 Cir., 168 F.2d 672; The Queen Elizabeth, 2 Cir., 122 F. 406, certiorari denied sub nom. Holmes v. The Queen Elizabeth, 190 U.S. 560, 23 S.Ct. 855, 47 L.Ed. 1184. Here the situation which obtained at the moment the Nashbulk starboarded had long been foreseeable as a possibility and, as already observed, it must be assumed that the Nashbulk's master had ample opportunity for the exercise of considered judgment in taking timely steps to cope with it. Indeed, his excuse for not blowing shows that he deliberately took his choice and decided, unjustifiably, to refrain from signaling.

■ Yet it is clear that the change of course the Nashbulk made was not itself a contributing cause of the collision. It did

not mislead the Rutgers Victory or hamper her navigation in any way. Although she was where the Nashbulk was in fact in sight, as a matter of fact the Nashbulk was not seen because the Rutgers Victory did not make the slightest use of her ample opportunity to see her. Thus the utterly inexcusable fault of the Rutgers Victory to observe what was plain to be seen put her in a situation which, though literally within the language of Article 18, was actually not within the contemplation of the rule, which requires a vessel to signal a change of course only when vessels are in sight of each other. The obvious purpose of the rule is to give notice which will enable the notified vessel to navigate with due regard for the change. And it is quite as obvious that the rule presupposes that the vessels already know of each other's presence.

█ This brings us to the most important question raised on this appeal. It is whether the burden which rests upon a vessel involved in a collision and guilty of a statutory fault, which is as stated in The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, to show "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been," was discharged in the circumstances here shown. It was, provided it was enough to show that per se the change of course unsignalled had no different effect upon what happened than it would have had if the signal had been given. But it was not, if every incidental, probable effect of the signal as a call to take preventive action must also be negatived. The Ninth Circuit dealt with a similar question arising under the Inland Rules and said in Crowley Launch & Tugboat Co. v. Wilmington Transp. Co., 117 F.2d 651, 653 that, "A master cannot be charged with causatively contributing to a collision by failing to blow the full astern signal when, in the circumstances, his reversing would not affect the navigation of an approaching vessel, because, if blown, it might have operated as a warning signal to that vessel which, without his knowledge, was violating the [lookout] rule."

On the other hand at least two English cases, The Atland, 76 Lloyd's List L. R. 38 and The Jean Jadot, 75 Lloyd's List L.R. 153, are to the effect that if a signal is required for any reason its probable overall effect is what counts in determining whether the fault in failing to give it is a contributing cause of a collision.

█ We are, however, inclined to accept the view that where, as here, the unsignalled change of course could not have been a contributing cause of the collision, the fault in failing to give the signal required by Article 18, 33 U.S.C.A. § 103, cannot be held a contributing cause. In other words the Nashbulk, not being required by statute to warn the Rutgers Victory of her presence nor so required by the dictates of prudent navigation since she could take it for granted that her presence was known, was under an obligation imposed by Article 18 only to indicate her change of course to give timely notice of that. She has discharged her burden under the rule of The Pennsylvania, supra, coextensive with her obligation under Article 18. She cannot therefore be forced to pay half the damages merely because the other vessel was so grievously at fault that she needed, and might have put to good and effective use, an alerting signal which the rule did not require. Indeed, to allow that would simply put a premium upon gross negligence in navigation, for had the Rutgers Victory not been "as blind as one who will not see" no alerting signal would have been of any use and the exoneration of the Nashbulk would have followed almost as a matter of course.

Affirmed.

L. HAND, Chief Judge, dissenting in separate opinion.

L. HAND, Chief Judge (dissenting).

My brothers have accepted the holding of the Ninth Circuit in Crowley Launch & Tugboat Co. v. Wilmington Transportation Co., 117 F.2d 651, that the purpose of the steaming signals does not include alerting the vessel to which they are addressed, but is only to advise her of what the signalling

vessel proposes to do, so that she may co-operate. Consequently they hold, as I understand them, that if the vessel, to whom the signal should have been addressed, is not aware of the presence of the vessel which should have signalled, the failure to signal does not contribute to the collision. This presupposes that the ·duty to signal is owed only to ships which are attentive enough to have observed the vessel which should have signalled. I can see no reason so to limit the purpose of the rule, and apparently the English courts agree that it should not be so limited. The Ninth Circuit held as it did because the Inland Rules provided for an "alarm signal" which is to be given, not to indicate a proposed change of navigation, but only to alert the other vessel. Yet even under the Inland Rules I do not understand that it is necessary to give an alarm as well as the signal, appropriate to the change of navigation proposed by the signalling vessel. Be that as it may, under the International Rules, no "alarm" is permitted; and surely it is as desirable to awaken an inattentive vessel and to advise her of the proposed change, as it is to advise an alert vessel of that change. The rules are to be construed, I submit, so as best to avoid collision, and to arouse a vessel, which, as here for example, was giving every evidence of inattention, would seem to be even more desirable than to announce a change to an attentive vessel. If a vessel does not signal, it is, or it should be, because she thinks she will pass safely; and I find it hard to understand the reasoning which excuses her when she thinks she will not pass safely, because the other vessel stands in exceptional need of being informed that she does not.

I do not think that the Nashbulk proved beyond a reasonable doubt that, had she blown, the Rutgers Victory would not have taken the steps necessary to avoid collision; indeed, I am not sure that my brothers disagree as to that! In any event, it is eminently likely that she would have taken them, and it is clear that adequate steps were in fact open to her. I do not mean that I should divide the damages equally, if I were free to divide them proportionately to the relative fault of the vessels. An equal division in this case would be plainly unjust; they ought to be divided in some such proportion as five to one. And so they could be but for our obstinate cleaving to the ancient rule which has been abrogated by nearly all civilized nations. Indeed, the doctrine that a court should not look too jealously at the navigation of· one vessel, when the faults of the other are glaring, is in the nature of a sop to ·Cerberus. It is no doubt better than nothing; but it is inadequate to reach the heart of the matter, and constitutes a constant temptation to courts to avoid a decision on the merits. Nevertheless, so long as our antiquated doctrine prevails, I think we should apply it unflinchingly, and in the case at bar I would ·divide the damages.