**Charles DAVIS, Libelant,**

v.

**THE U. S. Oil Screw DEWEY, and Patricia Ann Webb and Frances Louise Webb, t/a Webb-Bunker Company, Respondents.**

**No. 227.**

United States District Court
E. D. North Carolina,
New Bern Division.

Jan. 24, 1956.

Claud R. Wheatly, Jr., Beaufort, N. C., for libelant.

George Rountree, Jr., Wilmington, N. C., Deutsch, Kerrigan & Stiles, New Orleans, La., for respondents.

GILLIAM, District Judge.

This case arises out of a collision between the oil screw Dewey, a menhaden

fishing vessel owned by the respondents, and the shrimp trawler Dixie B owned by the libelant. The collision occurred on the morning of November 12, 1954, in the waters off Cape Lookout, N. C. The libelant and the respondents are citizens and residents of this District. The Dewey is within the District. Respondents admit the negligence of the Dewey, but contend that the Dixie B was also at fault and that damages should be divided. The Dixie B was sunk and became a total loss. The Dewey was not damaged at all.

The libelant's lost ship, Dixie B, was a shrimp trawler of 70 feet overall length. Her breadth was 18 feet, 6 inches; and her draft was 7 feet. Certain peculiarities of her construction and the details of her history will be considered at greater length when I reach the question of valuation.

The respondents' Dewey is a larger vessel of some 90 or 100 feet in length with a draft of 8 or 9 feet.

On the morning of November 12, 1954, the sea was calm. The wind was negligible, visibility was unlimited.

To the north of Cape Lookout lies Raleigh Bay. The coastline of that bay is referred to locally as the "Eastern Beach". To the south of Cape Lookout lies Onslow Bay. The coastline of that bay is referred to locally as the "Western Beach". Along the shore of Cape Lookout between the two bays is a passageway known as "the slough". It is a channel marked by buoys between the dangerous sandy shoals which range out from the point of the cape. The northernmost buoy marking the channel is a quick flashing green one. About a mile to the south lies a black and white nun buoy marking the center of the channel. Looking southward from the black and white buoy, the channel bears to the west about a buoy marking the Thistleroy wreck.

This channel broadens generally from south to north. The collision occurred in the northern half between the black and white buoy and the green flashing buoy.

All witnesses agree that it was on the western side of the channel. The master of a vessel present but not involved in the collision estimated that the width of the channel at the black and white buoy was about three to four hundred yards from shoal to shoal on the day of the collision. I find that the distance was a minimum of four hundred yards at the point of collision.

On the morning in question, the shrimper Evelyn D. Smith pulled in her nets at around 7:00 A.M. She lay between the flashing green buoy and the Eastern Beach. While she was engaged in this operation, the Dixie B. approached and stopped. Captain Hill of the Evelyn D. indicated to Captain Gaskill of the Dixie B. that no shrimp were to be had in that vicinity.

When the nets were in, the Evelyn D. proceeded southward through the slough, bound for the Western Beach. The Dixie B. followed in her wake at between a hundred and a hundred and fifty yards to the rear. Captain Gaskill on his deposition estimates their speed at nine miles per hour. Captain Hill estimated at trial that their speed was between six and eight miles per hour over the ground. I find that the speed was eight miles per hour and that this speed was not lessened before collision.

As the two shrimpers proceeded into the slough the Dewey and another "pogey boat", as they are called, were sighted between the Thistleroy buoy and the black and white nun buoy nearer to the nun buoy. A radio conversation took place between Gaskill and Hill.

Hill gave the following version on cross-examination. "Hadn't we better wait until these pogey boats get through the slough before we go through?"

Gaskill's version on deposition was: "I said, 'Leroy, you better watch those pogey boats coming through there.' He said, 'That's alright. We got plenty room. They can go one way, we can go on the other.'"

The respondents contend that this warning by the captain of the libelant's

Dixie B. indicates that uncertainty or fear was in his mind at that point. However, I am satisfied with Gaskill's explanation that, in effect, he was acting for the Evelyn D. as an unsolicited lookout.

Furthermore, in accord with my finding that the channel was a minimum of four hundred yards wide, (it may have been eight hundred to a thousand) it seems probable that Gaskill's version of the question put to Hill is more accurate in its wording. Rose, a crew member on the Evelyn D., testified that there was room for three or four boats to pass in the channel.

As the two shrimpers proceeded southward, keeping to their starboard, or the western, side of the channel, the Dewey rounded the black and white buoy. Instead of straightening from her turn and running for the green flashing buoy, she continued turning to her port in a gradual arc to the west. Witnesses differ sharply in their estimates of course, time, speed, and distance.

The distance from the black and white buoy to the green buoy is approximately a mile. The point of collision was about half way between the two but west of the center line of the channel and almost on the western shoal along the beach. Indeed, had the Dewey not struck the Dixie B., she would have run aground. There was scarcely two feet of water beneath the keel where the wreck occurred.

The Dewey did not reverse her engines until after the collision when she did so in order to back her bow out of the hull of the Dixie B. which was struck almost broadside and was penetrated five feet. The speed of the Dewey was at least as great as that of the Dixie B. No whistle signals were sounded before the wreck.

The Dixie B. rapidly filled with water and settled onto the shallow bottom. Salvage attempts failed. She broke up on the shoals and was a total loss.

The libelant contends that the International Rules apply in the slough. The respondents contend that the Inland Rules govern navigation there. In my opinion, the respondents are correct.

The determination must be made under the general provisions of Section 82.2 of the current U. S. Coast Guard Regulations. Pertinent provisions are stated as follows: "At all buoyed entrances from seaward to bays, * * * waters inshore of a line approximately parallel with the general trend of the shore, drawn through the outermost buoy or other aid to navigation of any system of aids, are inland waters * * *" The buoyed entrance involved here led from one bay to another, Onslow and Raleigh. However, I believe that the result of the case is the same under either set of navigation rules.

Respondents urge that the libelant was at fault in the following particulars: 1) Captain Gaskill was incompetent. 2) He failed to signal for a passing agreement if under the Inland Rules or to signal a change of course under the International Rules. 3) He failed to give a danger signal if under the Inland Rules. 4) He failed to reverse under either set of rules.

Since statutory violations are involved, the respondent urges that the burden imposed by the rule of The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, must be invoked against the libelant. I shall consider these purported faults in the order that they are listed.

1) *The Captain of the libelant's vessel was incompetent.* There is no merit in this contention. Gaskill was a man of ample experience. The respondents' contention is largely based on Gaskill's inability to handle hypothetical problems posed by counsel. It is urged that he was unable to estimate speed, distance, and stopping time accurately. I believe that it is more plausible to say that he, in common with most people, did not translate visual images into miles per hour, yards, and minutes. The Captain's admitted uncertainty as to which navigation rules were applicable in the Cape Lookout Slough is shared by this Court.

2) *The libelant failed to signal for an agreed passing if governed by inland*

Rule 1, art. 18, 33 U.S.C.A. § 203, rule 1, or to *signal a change of course under International Rule, art. 28, 33 U.S.C.A. § 113.*

3) *The libelant failed to sound the danger or doubt signal provided for by Rule III of Article 18 in the Inland Rules.* I shall take up these assignments of fault together. It is established that none of these signals were given. The universal practice was that boats met and passed one another port to port in this channel without giving any passing signals. In Griffin on Collision, Sec. 68, p. 201, there is the following summation. "In practical navigation it is, of course, true that, where the mode of passing is obvious, whistle signals are frequently omitted. While the Half-Mile Rule may require such signals, it is believed that the courts would be slow to condemn a vessel merely for failing to announce by whistle an obvious intention, if the real cause of collision were a distinct act of negligent navigation on the part of the other vessel." I shall be slow indeed to do so.

The first "distinct act of negligent navigation" that I find on the part of the Dewey is that she was on the wrong side of the channel. All witnesses are in accord on that point. In The Haven Belle, 4 Cir., 1936, 85 F.2d 939 at page 941, the Court of Appeals for this Circuit said: "Whatever view be taken of the case, it is perfectly clear, not only that the collision could not have occurred, but also that not even a dangerous situation could have been created, if the Haven Belle [Dewey] had stayed on her proper side of the channel and obeyed the passing rules. Had she done this, no danger from the crossing of the courses of the two vessels could have arisen."

The Court went on to apply the major-minor fault rule, set out in its classic form in The City of New York, 147 U.S. 72 at page 85, 13 S.Ct. 211, 37 L.Ed. 84.

Another case in which the major-minor fault rule was applied was The Victory (The Plymothian), 1897, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519. A diagram incorporated into the report discloses a collision course similar to that of the Dewey and the Dixie B. At page 426 of 168 U.S. at page 156 of 18 S.Ct.: "Each of these vessels was entitled to presume that the other would act lawfully; would keep to her own side; if temporarily crowded out of her course, would return to it as soon as possible; and that she would pursue the customary track of vessels in the channel, regulating her action so as to avoid danger."

The Haven Belle and The Victory are distinguishable from the case at hand in that whistle signals were made, but were misunderstood because of bad weather. However, I cite and quote these cases to emphasize the key obligation of a vessel to keep on its own side of the road.

The second "distinct act of negligent navigation" which the Dewey was guilty of was running without a lookout and without anyone at the wheel. I find this as a fact upon the following evidence.

(a) Captain Hill of the Evelyn D.:

"Q. Did you see anybody in the wheel house of the Dewey? A. No, sir. I didn't look to see if there was anybody.

"Q. You couldn't see if anybody * * *? A. No, sir.

"The Court. You don't say there was no one there? A. No, sir, I don't."

(b) Norwood Rose, deck hand on the Evelyn D., speaking of the Dewey: "Never saw a man on the boat as she went by. I am not saying a man won't on the boat."

(c) Cecil Gilgo, deck hand on the Evelyn D.:

"Q. Was anybody in the wheel house of the Dewey? A. No, sir.

"Q. Did you look? A. No, sir. When the boat passed I looked up that way. I should say he was fifty yards of us. We passed our stern.

"Q. Could you see anybody in the wheel house? A. I never looked."

(d) Maurice Nelson, deck hand on the Dixie B.:

"Q. Could you see the Dewey as she came up? A. Yes, sir.

"Q. Could you see in the pilot house of the Dewey? A. Not at that time.

"Q. Could you ever see in there? A. Yes, sir.

"Q. Could you see the steering wheel? A. No, sir.

"Q. See anybody in there? A. No, sir.

"The Court. You didn't see anybody at the wheel? A. As far as I know nobody.

"Q. You know the wheel is in the pilot house on the Dewey? A. Yes, sir.

"Q. Ever been on the Dewey? A. No, sir.

"Q. You have looked in pilot houses on other occasions? A. Yes, sir.

"Q. If anybody standing at the wheel on the Dewey could you have seen him? A. I would think so."

Most of this evidence is merely negative. However, when I consider with it, the radical, inexplicable behavior of the Dewey, I am convinced that there was neither an eye to see nor a hand to steer.

In the Ariadne, 1872, 13 Wall. 475, 20 L.Ed. 542, it is said with regard to lookout duty that, "Every doubt as to the performance of the duty, and the effect of non-performance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary."

Again in Agger v. The Beatrice and Rose, D.C.Me.1949, 84 F.Supp. 761 at page 763, I read, "There was no evidence on the part of the claimant to show that a lookout was posted on his bow. The absence of such a lookout may well have been a contributing cause of the accident. The failure of claimant to give such evidence warrants the court in assuming that there was no lookout."

The respondents have not introduced any evidence from the Captain of the Dewey or from any crew members.

Concluding, as I do, that the Dewey ran blindly into collision, what is the effect of her grievous fault upon the Dixie B.'s failure to signal? In the discussion of the following cases, I shall substitute the names Dewey and Dixie B. for the actual names of the ships involved.

Crowley Launch & Tugboat Co. v. Wilmington Transp. Co., 9 Cir., 1941, 117 F. 2d 651, was decided under the Inland Rules. The Dixie B. stopped dead in the water far from the Dewey. The Dixie B. failed to give a signal when she reversed her engines to make the stop. The Dewey was without a lookout. The Court held that this was a special circumstance covered by Rule 29. When the Dewey sheered into the Dixie B. as a result of the Dewey's erroneous turn to port, the Dixie B. was in extremis and not at fault for failure to sound a danger signal. The Dewey was held solely liable.

In National Bulk Carriers v. United States, D.C.S.D.N.Y.1948, 80 F.Supp. 188, the burdened ship in a crossing situation was without a lookout. The privileged ship failed to signal her alteration of course away from danger. The burdened ship was held solely liable. On appeal the decision was upheld in an opinion by Chase, J., 2 Cir., 1950, 183 F. 2d 405. Judge Learned Hand dissented, 183 F.2d 409. The majority of the court held that turn signals were intended to advise and not to awaken. Since the Dewey was running as a derelict on the seas, the failure to signal could not have been a cause of the collision. The burden of the Pennsylvania Rule was satisfied.

In Oaksmith v. Garner, 9 Cir., 1953, 205 F.2d 262, the collision occurred on an inland channel at night. The Dixie B. sounded no meeting signal, no bend signal, no danger signal. The Dewey's pilot house was unmanned. The Dixie B.'s neglects were held to not be within the Rule of The Pennsylvania.

■ On the grounds of the foregoing authorities, I conclude that the true Dixie B.'s neglect of signals should not preclude her owner's recovery of full damages for her loss.

■ 4) *The Dixie B. failed to reverse her engines and stop under either set of navigation rules.* It is a momentous cliche that there is no right of way

into collision. Proctors for the Dewey stoutly maintain that the Dixie B. is at fault because she maintained her course as the Dewey bore down upon her. Captain Gaskill of the Dixie B. testified that as the Dewey approached, he "kept working off to the starboard a little bit". It is implicit in the discussion under the foregoing assignments of fault that if the International Rules should be applied to the slough, this slight heading away from a possible danger would not warrant condemnation for neglect of a one blast signal for change of course. See The William J. Riddle, D.C.S.D.N.Y. 1952, 102 F.Supp. 884, affirmed United States v. United States Lines Co., 2 Cir., 200 F.2d 608.

The Dixie B. continued to tract the western shoal. Her Captain was properly supposing that the Dewey would turn and follow her normal course to the green flashing buoy at the north end of the channel. What possible reason did he have for guessing the awful truth, that the Dewey's wheel was unmanned?

It became apparent that the Dewey was not going to turn from her destructive path briefly before disaster struck. The Dixie B. turned hard to starboard into the western shoals that she already was near. There she was struck.

Any evaluation of her navigation in that last moment when danger became apparent must not be too critical, now made with the benefit of hindsight.

■ I conclude that the Dixie B. was in a state of extreme peril. She had not contributed to the creation of that condition. Her turn to starboard is not subject to legal criticism.

It is my opinion that the negligence of the Dewey was the sole cause of the collision, and that the respondents must bear the full loss of the Dixie B. What is the amount of that loss?

The Dixie B. was built in Washington, N. C. in 1945. She was constructed for a New England firm for use on northern fishing grounds. Her hull was of exceptionally heavy material and sturdy construction necessary for use in that area. She carried 15 tons of ballast, about twice the amount carried in southern shrimp boats of lighter build.

In 1949 the libelant purchased her as a burned out, gutted hull. She was rebuilt from the ground up and equipped as a shrimp trawler. In 1953, she was run aground at Ocracoke. The libelant salvaged her and again rebuilt. A new engine was installed. At the time of the wreck with the Dewey she was in first rate condition and was doing well the work of a shrimp trawler.

■ The libelant contends that, due to her heavy, northern type hull, the Dixie B. was a unique vessel for which no market value can be ascertained by comparison with the lighter Florida and Biloxi type shrimp boats used universally in the South. Therefore, he says, that her loss must be ascertained by her replacement cost.

I do not agree. At the time of the wreck, the libelant had a first class shrimp boat and nothing more. He had a Cadillac hearse outfitted to do the work of a Ford or Chevy delivery wagon. His recovery must be on that basis.

It is my conclusion that the value of the Dixie B. on the date of loss was $40,-000, and that sum will be awarded libelant.

Libelant will present decree.