UNITED STATES of America, owner of DREDGE ESSAYONS, Libelant,

v.

The TANK VESSEL NORTH DAKOTA and Texaco, Inc., formerly The Texas Company, Claimant-Respondent.

TEXACO, INC., formerly known as The Texas Company, owner of TANK VESSEL NORTH DAKOTA, Cross-Libelant,

v.

UNITED STATES of America, owner of DREDGE ESSAYONS, Cross-Respondent.

United States District Court
S. D. New York.
Feb. 15, 1962.

---

17. Euclid, Ohio, v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303.

18. Erie R. R. Co. v. Williams, 233 U.S. 685, 34 S.Ct. 761, 58 L.Ed. 1155.

Robert M. Morgenthau, U. S. Atty., Louis E. Greco, New York City, Atty. in Charge, Admiralty and Shipping Section, Dept. of Justice, George M. Bates, New York City, of counsel, for the United States.

Brush & Michelsen, New York City, Joseph M. Brush, New York City, of counsel, for Texaco, Inc.

CASHIN, District Judge.

These consolidated suits in admiralty arise out of a collision between the United States dredge ESSAYONS and the tanker NORTH DAKOTA in Ambrose Channel on January 26, 1959. Texaco, Inc., the owner and operator of the tank vessel NORTH DAKOTA, is a Delaware corporation with a place of business in New York City. The ESSAYONS, a steam dredge operated by the United States Corps of Army Engineers, is 525 feet in length with a beam of 72 feet. The NORTH DAKOTA is a steam tank-vessel 541 feet long with a beam of 75 feet.

On the morning of January 26, 1959 the dredge ESSAYONS was proceeding inbound in Ambrose Channel, New York Harbor, performing dredging work in the general area of Buoys Nos. 10, 12 and 14. At approximately 10:30 A.M. of that date, the ESSAYONS began dredging shoals in a position about 750′ west of Buoy No. 12. At that time, and during the remainder of the morning of January 26, 1959, visibility in the area was good, the tidal current was slack

water before ebb tide, the winds were gentle to moderate, north northeast, and the temperature was about 27°–30° Fahrenheit.

The speed of the ESSAYONS was 1.2 knots and she had her starboard drag on the bottom. She was following a course to take her from a position of about 750′ west of Buoy 12 to a position about 250′ west of Buoy 14. On the bridge of the ESSAYONS were her master, Captain Miller, Romano, Third Mate, and Souza, Quartermaster who was on the wheel. The ESSAYONS was displaying the proper day signal of two black balls to indicate that she was a self-propelled suction dredge underway and engaged in dredging operations, such signal being required by the Pilot Rules for Inland Waters, 33 C.F.R. § 80.21.

An informational "Sketch Map Notice to Navigators" had been promulgated, published and mailed by the United States Army Corps of Engineers to vessel owners, Sandy Hook pilots and others for the purpose of alerting maritime interests that the ESSAYONS would be engaged in dredging in the general area near Buoys Nos. 10, 12 and 14 in Ambrose Channel.

During the morning of January 26, 1959 the tanker NORTH DAKOTA was also proceeding inbound in Ambrose Channel enroute from Port Arthur, Texas, to Bayonne, New Jersey, fully loaded with petroleum products. The NORTH DAKOTA was being piloted by a Sandy Hook pilot who boarded the vessel at approximately 10:18 A.M.

When the NORTH DAKOTA entered Ambrose Channel she was proceeding at full speed of 80 rpms. making 13–14 knots. At the time those on board observed the ESSAYONS ahead in the vicinity of Buoy No. 10. When the NORTH DAKOTA was about abeam of Buoy No. 10 the ESSAYONS was still ahead "between the 12 and 14 buoy, but closer to the 14". The NORTH DAKOTA was then approximately 500 feet from the starboard side of the channel and as she came around Buoy No. 10 her

pilot ordered the quartermaster to steady up on 322° true. At this time the pilot of the NORTH DAKOTA estimated the ESSAYONS to be about three-quarters of a mile ahead and nearing Buoy 14. The NORTH DAKOTA then blew two short blasts of the whistle to signify her intent to pass the ESSAYONS on the ESSAYONS' port side.

At 10:53 A.M. Captain Miller of the ESSAYONS heard "two whistles from a vessel astern". The ESSAYONS' third mate, Romano, saw the NORTH DAKOTA about 1000 feet astern, heard her two blasts signal and reported it to Captain Miller. Captain Miller immediately ordered Romano to answer with two blasts of the whistle for the purpose of assenting to the NORTH DAKOTA's two blasts of the whistle signal, which Romano did within "a matter of seconds". Those on board the NORTH DAKOTA failed to hear the ESSAYONS' answering signal and claim that none was given. However, I find that the ESSAYONS did answer the NORTH DAKOTA's signal. It is possible that the ESSAYONS' answering signal was not heard because the windows of the pilot house of the NORTH DAKOTA were closed. Another possibility is that the NORTH DAKOTA failed to hear the ESSAYONS' signal because it, the NORTH DAKOTA, blew a series of danger signals followed by a one-blast signal to indicate her desire to pass the ESSAYONS to the starboard. These series of blasts were given about 10 to 30 seconds after the NORTH DAKOTA gave her two-blast signal.

At about this time the Navy tanker CHATTAHOOCHEE was outbound in Ambrose Channel, on her side of the channel, having passed the ESSAYONS, and was in the vicinity of Buoy No. 11. The CHATTAHOOCHEE in no way interfered with the navigation of the NORTH DAKOTA. Captain Miller and third mate Romano, as well as those who heard them from the bridge of the CHATTAHOOCHEE, understood the series of short blasts from the NORTH DAKOTA to mean the danger signal only. Captain Miller immediately started to pick up the ESSAYONS' starboard drag and to increase the speed of the dredge.

The NORTH DAKOTA was proceeding at full speed until she sounded the danger signal, at which time she put her engines on slow speed. About one minute after that, the NORTH DAKOTA stopped her engines and, approximately three minutes after that, the flare of the port bow of the NORTH DAKOTA struck the starboard quarter of the ESSAYONS. The point of collision was about 200 feet west of Buoy 14, at a point where Ambrose Channel is about 2000 feet wide.

The NORTH DAKOTA claims that the accident was caused by the ESSAYONS suddenly swinging hard right. I find no evidence to support this theory. It is true that at the time of collision the ESSAYONS was in the process of changing her course from 323° true to 347° true to conform with the next leg of the channel. However, this was not a sudden turn but was a gradual one done "very easy".

The pilot of the NORTH DAKOTA, Bryant, as well as her master, Pederson, both received the aforementioned "Sketch Map Notice to Navigators" which indicated that it was planned that a Corps of Engineers dredge would be dredging on the starboard side of the channel near the general area of collision on the date in issue. The Sketch Map stated that "Navigators are cautioned to slow down and proceed with care in this vicinity". Both the pilot and the master of the NORTH DAKOTA saw the ESSAYONS' signal of two black balls flying and both understood it to mean that the ESSAYONS was engaged in dredging although the pilot understood the signal to mean "to proceed with caution" and the master understood it to mean "to slow down" and to pass, if possible, at a greater distance than an ordinary steamer.

I find that the NORTH DAKOTA was solely at fault for the collision be-

tween itself and the United States Army Engineers' dredge ESSAYONS, which occurred on January 26, 1959, off Buoy No. 14 in Ambrose Channel, New York Harbor. The NORTH DAKOTA was at fault in failing to slow down her speed of 13 to 14 knots until she was within less than three-quarters of a mile of the ESSAYONS. Under the circumstances, the speed of the NORTH DAKOTA was negligently excessive. It is very possible that if the NORTH DAKOTA had been proceeding at a slower rate of speed, or had put her engines on stop and reverse as soon as she first sounded her danger signal, the accident could have been avoided. The George H. Jones (2 Cir. 1928) 27 F.2d 665; Socony-Vacuum Oil Co. v. Smith (5 Cir. 1950) 179 F.2d 672; 33 C.F.R. § 80.27.

 I find that the ESSAYONS was without fault. She properly held her course and speed, which was inclusive of her slow turn to the right to conform to the course of navigation incident to a change in the channel course. Skibs Aktieselskapet Orenor v. The Audrey (E.D.Va.1960) 181 F.Supp. 697, aff'd. (4 Cir. 1961) 287 F.2d 706. The ESSAYONS was not, under these circumstances, required to have a lookout aft before the overtaking signal of the NORTH DAKOTA. Publicover v. Alcoa S.S. Co. (2 Cir. 1948) 168 F.2d 672; The Holly Park (2 Cir. 1930) 39 F.2d 572.

I find that the accident was caused solely by the negligence of the NORTH DAKOTA. There was plenty of room for the NORTH DAKOTA to safely pass the ESSAYONS on her port side and her failure to do so, in light of the ESSAYONS' assent to such a passing, was the cause of the accident. The evidence shows, and I so find, that the ESSAYONS held her normal course and the accident was caused by the impatience and negligence of the NORTH DAKOTA.

The above shall constitute my Findings of Fact and Conclusions of Law.

Settle an interlocutory order on notice.