## ATLANTIC MUT. INS. CO. et al. v. THE BULKCRUDE et al.

### No. 93.

United States District Court
S. D. Texas, Corpus Christi Division.

Feb. 29, 1952.

772

Royston & Rayzor, Robert Eikel, Houston, Tex., for libellants.

Fulbright, Crooker, Freeman & Bates, Carl G. Stearns, Houston, Tex., for respondents.

ALLRED, District Judge.

Libellants, hull underwriters of the Tug, R. J. Wales, instituted this proceeding to recover losses paid to the tug owners for damages to the Wales, allegedly caused by the negligence of the pilot of the tanker, Bulkcrude. The evidence was confined on the hearing to the question of fault, the amount of damages to be determined hereafter is. necessary. The Wales, on a hawser ahead of the Bulkcrude, was tripped and sunk in breaking a sheer of the tanker. The Captain of the Wales was drowned and the parties made a settlement with his estate, without prejudice.

### Findings of Fact

The tugs, R. J. Wales and Roy Hoober, were assigned to assist the Bulkcrude in departing from docks in the western end of the Corpus Christi Turning Basin, under a written contract appended to a tariff schedule of charges for services published by Bay-Houston Towing Co. It provided in part as follows:

"The rates quoted herein and the towage undertaken hereunder are founded on the consideration that Bay-Houston Towing Co., or its tugs * * will not be liable for damages caused by the tow to other property, whether resulting in whole or in part from the negligence of the towing company or its tugs or the charterers of its tugs; the masters and crews of the tugs shall be considered servants of and identified with the vessel or craft towed."

The Bulkcrude is a large, 120,000 barrel tanker with a draft of 31 feet. It was loaded and docked in the Avery Point Turning Basin, which constitutes the northwestern end of the Corpus Christi Turning Basin. The ship channel has a generally uniform depth of 34 feet but narrows to approximately 100 feet at this depth in a slightly southwesterly direction from Avery Point for about a mile where it widens directly east into the Main Turning Basin and passes under the Bascule Bridge into the Port Aransas Waterway. (See Libellant's Ex. 8.)

The Nueces County Navigation Commission has issued instructions requiring all vessels over 200 feet in length in the Port of Corpus Christi to be aided by a tug in passing through the Bascule Bridge. The bridge is only 84 feet wide and there is not room for a vessel the size of the Bulkcrude and a tug to pass, except the tug be on a hawser ahead. Actually this is of very little, if any, assistance to the vessel in making the passage.

The most efficient method of assisting the vessel down the channel to the Main Turning Basin is to have one tug on each bow. Upon reaching the Main Turning Basin there is ample room and time for one of the tugs to go forward on a hawser and then proceed ahead through the bridge, the other dropping off.

On the night of January 10, 1949, the Bulkcrude sailed from the Avery Point Basin with the Wales on a single hawser about 125 feet in length and the Hoober made fast on the starboard bow. This arrangement was consented to, if not directed, by Captain Montgomery, the pilot on the Bulkcrude, in charge of the operations.

The night was clear and the vessel proceeded down the channel on its own power at about three miles per hour nearly to the point where it would have to swing out into the Main Turning Basin and line up for the bridge. At this point it took a sheer to the starboard which, unchecked, would have caused it to strike the General American docks.

In an effort to break the sheer, the pilot, standing on the Bulkcrude's starboard bridge, ordered the vessel hard to port and full ahead. At the same time he signalled the Wales to pull to port and full ahead; and the Hoober full ahead. The Wales obeyed the pilot's orders and an instant later was almost abeam of the Bulkcrude and listing, with the hawser taut over the tug's stern on the starboard.

The pilot, meantime, had been watching to starboard of the Bulkcrude, to see whether it was going to clear the General American docks. He paid no attention to the Wales until a mate, on the starboard bridge with him, said "the tug is turning over". The pilot then looked and the tug was going under. If his attention had been called to it earlier, the pilot could have blown a stop order and averted the sinking.

When the pilot saw what had happened, he ordered the Hoober to pick up the tug's crew in the water. All save the Captain of the Wales were rescued.

The hawser was made fast to the Wales through a pelican hook which releases easily and automatically when a small metal bolt or pin is struck a heavy blow; or, with the hawser taut as it was, a single blow with an axe will sever it instantly. A member of the crew of the Wales was standing by for this purpose. After the perilous position of the tug became apparent, he waited and hoped for an order from the Captain to strike the pin but none came. He finally attempted on his own to release the pin with a piece of pipe but it was too late. If the Captain of the Wales had given a timely order, the hawser could have been released by either method and the accident averted. He gave no such order, nor did he receive any order from the pilot to do so.

The hawser was attached to the Bulkcrude by turns, in figure eights, around two bits. By taking these turns six or eight times, the hawser would not slip; but, by loosing this line two or three times, it would be released from the Bulkcrude. The chief officer and two members of the crew were standing by the lines on the Bulkcrude in position to let it go. When they saw the Wales tilt, they started taking turns off the bits, but by this time it was

completely over, abeam from the forecastle head, and the line parted before it could be released. ·

All these things happened in a matter of seconds, not more than a minute and a half from the time of the sheer until the Wales capsized.

Six days before the pilot of the Bulkcrude had taken a sister ship of the Bulkcrude out and it had sheered at about the same spot. At that time, the Hoober, a different type tug from the Wales, was on a hawser ahead and another tug on the port bow. The sheer was broken on that occasion without difficulty by the tug on the port bow going full ahead. The Wales, however, in the language of the pilot, was "tricky" on a hawser. The pilot knew this but either directed, or acquiesced in the request of the Wales' Captain, that the tow be made up as it was.

### Conclusions of Law

■ 1. The pilot of the Bulkcrude was negligent in permitting the tow to be made up as it was, under all the circumstances; and in failing to observe the plight of the Wales in time to order it cut loose, or to order that the Bulkcrude crew release the line.

■ 2. The sheer of the Bulkcrude is presumptive evidence of negligence,[1] especially since the same pilot had sustained a sheer at substantially the same place in a sister ship four days before.

■ 3. This negligence on the part of the pilot and the Bulkcrude was a proximate cause of the tripping and sinking of the Wales.

■ 4. The action of the Captain of the Wales in pulling too far over to port,

in hanging on beyond the point of safety and in failing to order the line cast off when the tug's perilous position became manifest also constituted negligence which was a proximate cause of the tripping.[2]

■ 5. Since the tug and the Bulkcrude were equally negligent, I think this is a case for divided damages.

■ 6. Pointing to the provision in the towing agreement that the master and the crew of the tugs shall be considered servants of the tow, libellant contends this relieves the tug of any responsibility for the negligence of her own crew and makes the Bulkcrude liable for any damages caused to the Wales. Respondent contends that such a construction would render the contract void. I find it unnecessary, however, to discuss the many cases cited as to the validity of contracts exempting from liability. The clause relied upon by libellant, making the tug's crew servants of the tow, must be read in connection with the language immediately preceding, from which it is separated by a semicolon only. That language is that the *tug* "will not be liable for damages *caused by the tow to other property*, whether resulting in whole or in part from the negligence of the towing company or its tug or the charterers of the tugs". (Emphasis supplied.) I do not construe this as an indemnity to the tug for *its* negligence resulting in damage to itself. Exemptions from liability and contracts of indemnity must be construed strictly. The language should be clear and free from doubt. That is not the situation here.

Decree will be entered adjudging divided liability for whatever damages may hereafter be assessed.

The Clerk will notify counsel to submit an order accordingly.

1. The Eureka No. 91, D.C.N.Y., 67 F. Supp. 101; and cases therein cited. Respondent points to the fact that the cases presuming negligence from a sheer are *Collision* cases, but I see no real distinction; and here there is added the fact that the same pilot had encountered a sheer at the same place six days before with a sister ship. While the sheer then was broken without difficulty, the Hoober, an altogether different type of tug from the Wales, was on the hawser. The decisions of Judge Kennerly in Socony-Vacuum v. Dredge Geo. W. McWilliams, D.C., 101 F.Supp. 910, Id., D.C., 101 F.Supp. 912, are distinguishable.

2. Houston Towing Co. v. U. S., D.C.Tex., 23 F.2d 528. Were it not for the concurring negligence of the pilot set out above, I would hold this negligence of the Captain of the Wales to be the sole cause of the sinking.