472

UNITED STATES of America, owner of
THE S.S. GEORGE F. PATTEN,
Libelant,

v.

MOBILE TOWING AND WRECKING
COMPANY, a corporation organized
and existing under the laws of Ala-
bama, and THE Tug JOSEPH M.
WALSH, her tackle, apparel, engines,
boilers, furniture, and machinery, Re-
spondents.

No. 2506.

United States District Court
S. D. Alabama, S. D.

Sept. 21, 1956.

Ralph Kennamer, U. S. Atty., Mobile,
Ala., for libelant.

T. Massey Bedsole, of Hand, Arendall
& Bedsole, Mobile, Ala., for respondents.

THOMAS, District Judge.

This is an admiralty libel *in rem* and
*in personam* for collision damage. Re-
spondent corporation filed a cross-claim
for its collision damage. The cause is
before the court on the question of lia-
bility *vel non*.

Findings of Fact

The United States of America at all
times pertinent was the owner of the S.
S. George F. Patten, a type commonly
known as a Liberty Ship.

The tug Joseph M. Walsh at all times
pertinent was owned by the Mobile Tow-
ing and Wrecking Company, a corpora-
tion organized and existing under the
laws of the State of Alabama.

The Patten left New Orleans, Loui-
siana, fully laden, May 16, 1951, out-
bound for Rotterdam. At 3:42 a. m., May
18, 1951, her main steering gear failed.
The ship was then ordered to proceed to
the port of Mobile, Alabama, for repairs.
The Patten proceeded to Mobile under
her own power, steering by the after
emergency steering gear, which in all
ways functioned in proper working order
up to and including the time of the col-
lision. She arrived at the entrance of the
Mobile ship channel at 8:36 p. m., May
19, 1951.

The Patten had an adequate crew of
officers and men and was in a seaworthy
condition except for the failure of the
main steering gear apparatus.

Captain W. A. Raley, a member of the
Mobile Bar Pilot's Association, met the
Patten at the entrance of the Mobile bar
and went aboard to take charge of the
navigation of the ship up river. Mobile
is a compulsory pilot port. At the same
time and place, and at the request of the
owners of the Patten, the tug Joseph M.
Walsh met the Patten, to give aid and as-
sistance to her on the trip up the channel.
The tug's duty was to furnish steering
assistance so that the Patten would bet-
ter be able to maintain a safe and prop-
er course; but the tug was not to be
"the brains in control" of the trip up
channel.

The tug was in a seaworthy condition and properly manned with an adequate crew.

Before the tow was made up, there was some discussion between the master of the Patten, the pilot, and the master of the tug, as to the proper position in which to place the tug so that she might best be able to fulfill her duty of helping to guide the Patten. It was decided that it would be best to place the tug ahead of the ship; and the tug then took a line from the bow of the Patten to the stern of the tug. The line was furnished by the ship, was two hundred and fifty feet long, and was secured to the ship's double bitts on the starboard side of the bow by the use of figure eights. The line was secured to the stern of the tug by the use of a "pin type" pelican hook. The placing of the tug and method of securing the towing line to the ship and tug were both proper from a standpoint of seamanship.

The master of the tug stationed a member of his crew aft so that this man could be ordered, in case of emergency, to quickly cut the tow line by the use of an axe. The axe furnished the crewman was in good condition for the purpose of severing the tow line. Severing of a tow line in an emergency by the use of an axe is proper seamanship.

The towing operation began at approximately 10:20 p. m. The tug was directly ahead of the ship and the Patten proceeded under her own power, being steered from the after emergency steering station, with the order of slow ahead. The pilot gave the order placing the tug and generally was in charge of the combined movement. He and the master of the Patten were both on the flying bridge of the Patten during the movement. The night was clear and visibility good. There was a very light wind, and a strong easterly set to the current. The ship channel was clear of all other ship traffic. Speed was increased to half ahead at 10:30 p. m. The order to stop engines was given at 10:33 p. m., when the Patten had picked up speed to between three and five knots per hour. At this point

for some reason, unknown or unexplained, the bow of the Patten began to sheer to port, which change of course, if unchecked, would have caused her to run aground. To break this unexpected movement, the pilot ordered the tug to pull to starboard. In the execution of this order, the tug moved to starboard, and experienced a series of events climaxed by the collision of the ships and resulting in damage to both. The exact nature of these events, and particularly their causation, is not clear from the testimony. Immediately upon the tug's pulling to starboard, she began to swing to starboard in an arc at the end of the hawser, and took a heavy list to port which caused the port side of her deck to be under water. It appeared to several of the witnesses as though she was being dragged through the water against her power by the momentum of the Patten.

Some witnesses stated that the tug "tripped on her own line" and also that she became "rudder bound". Neither of these terms was explained. Other witnesses said they had never heard of such phrases, and did not know their meaning. There were conflicts in the testimony as to what time the pilot gave the order for the tug to let go the hawser, if indeed he ever gave such order.

All these things happened in a matter of moments, not more than two minutes from the time the Patten began to sheer to port until the tug's stern collided with the Patten a little forward of midship on her starboard side.

The pilot and the master of the Patten both knew of the disabled condition under which the Patten was laboring. As a matter of fact, the tug was ordered to the assistance of the ship to prevent just the situation which developed. It was known that the emergency steering gear was not adequate and safe for proper steering in close quarters.

The original libel claims damages to the Patten as the result of the collision, and alleges negligence in the operation of the tug. The cross-claim filed for damages to the tug alleges negligent operation of the Patten. A logical ap-

proach to the solution of this case requires that the two claims be considered in reverse order.

First, was the Patten guilty of negligence which proximately resulted in damage to the tug? I find the answer to this inquiry to be in the affirmative. The beginning of this mishap was when the Patten sheered to port. This sheer is presumptive evidence of negligence.[1] Especially is this so since the ship was proceeding under auxiliary steerage. All of the evidence is to the effect that from 22:20 to 22:30 the Patten was making a speed of "slow ahead". At 22:30, without advising the master of the tug, the speed of the Patten was increased to "half ahead" for a period of three minutes immediately prior to the sheering. It is true that a heavily laden ship the size of the Patten will gain very little momentum in the short period of three minutes. Nevertheless this increase in speed of the Patten, without notice to the tug, was a factor which the skipper of the tug needed to take into his calculations at the time the tug was given the signal to pull to starboard. Since the problem of bringing the ship safely to port was a steering problem, this increased speed on the part of the handicapped Patten, especially without notice to the skipper of the tug, was negligence which proximately contributed to the tug's being dragged through the water and being swung into the side of the Patten.

We now come to the question of whether or not there was any negligence in the operation of the tug which caused damage to the Patten. I find the answer to this inquiry to be in the negative. There was some testimony that the Walsh pulled too far to starboard. The weight of the evidence does not so impress me. There was testimony attributing negligence to the master of the tug in failing to give the order to cut the hawser in time, though such order was given and the hawser cut before the impact occurred. It is true that in this sequence of events, all happening in a matter of seconds, there was an indeterminable moment prior to which had the hawser been cut, the collision would have been averted, and subsequent to which, even though the hawser was cut, the collision would not have been averted. On the other hand, it is also true that the tug owed the Patten a duty to do all it reasonably could to prevent her from being beached when she sheered to port Had the master of the tug given the order to cut the hawser prior to the time of the tug's fulfilling this duty to the Patten, he and the tug's owners would have been guilty of negligence. The libelant insists, however, that the tug held on far beyond this point—long after fulfilling this duty—and that this over-determination on the part of the master of the tug was negligence. After a thorough consideration of the evidence, both by deposition and *ore tenus*, I can see no negligence on the part of the tug or its captain and crew. At most the captain of the tug may have been guilty of an error of judgment, and more specifically of an error of timing, neither of which was synonymous with negligence.[2]

Though the testimony of the captain of the Patten was not in accord therewith, the smooth deck log entry concerning this occurrence in part is as follows: "22:35 Strong easterly set of current apparently whipped tug around and, before he could cut the tow line, his stern collided with the ship on starboard side in way of frames 72 to 77 on first strake below sheer strake." Undoubtedly, the log entry made shortly after the occurrence more accurately describes the events than testimony taken months later.

1. Atlantic Mut. Ins. Co. v. The Bulkcrude, D.C.S.D.Tex., 107 F.Supp. 771; The Eureka No. 91, D.C.N.Y., 67 F.Supp. 101, and cases therein cited.

2. The M. M. O'Brien, D.C., 60 F.2d 976, 979: "Even if with the knowledge that comes after the event we might feel inclined to criticize the maneuver (which we are not), we should put ourselves in the place of the tug master and divest ourselves of the knowledge that comes after the event."

### Conclusions of Law

The swing of the bow of the Patten to port is presumptive evidence of negligence,[3] especially at the speed she was making and in the current she was in, considering her disability to steer properly in close quarters.

The negligence of the George F. Patten was the proximate cause of the accident.

Decree will be entered in favor of cross-libelant for whatever damages may hereafter be determined as the amount due in the premises.

