Ludvig LORENTZEN, as Owner of the SS CEARA, Libelant,

v.

The VESSEL MARTHA ANN, her engines, boilers, etc., and J. R. Atkins, doing business as Alabama Fruit and Produce Company, Respondents.

J. R. ATKINS, d/b/a Alabama Fruit & Produce Company, as owner of the M/V MARTHA ANN, Libelant,

v.

The M/V CEARA, her engines, boilers, furniture, apparel, etc., and against Ludvig Lorentzen, as Owner of the S.S. CEARA, Respondents.

Nos. 2868, 2869.

United States District Court
S. D. Alabama, S. D.
Sept. 18, 1962.

John H. Tappan, of Pillans, Reams, Tappan, Wood & Roberts, Mobile, Ala., for Lorentzen.

Rae M. Crowe, of Armbrecht, Jackson, McConnell & DeMouy, Mobile, Ala., for Atkins.

DANIEL HOLCOMBE THOMAS, District Judge.

These two actions involve a collision between the MV CEARA and the MV MARTHA ANN which occurred on the 7th day of November 1960, at 6:50 p. m., in Mobile Bay.

The MARTHA ANN is a twin screw, steel hulled, diesel propelled, ocean going, dry cargo vessel of Panamanian registry, and of 574 gross tons. She is owned by J. R. Atkins of Mobile.

The CEARA is a single screw, steel hulled, diesel propelled, ocean going, dry cargo vessel of Norwegian registry, of 2,464 gross tons. She is owned by Ludvig Lorentzen of Norway.

On the day in question, the MARTHA ANN was outbound from Mobile; the CEARA was inbound toward Mobile. The collision took place after dark. The visibility was good and both vessels had their navigation and running lights burning properly. (The CEARA was equipped with two masts and range lights; the MARTHA ANN had only one mast and one white light. It is not thought this affected the situation.)

On the bridge of the CEARA prior to the collision, and at the time of the collision, there was her Master, A. Friisoe; a licensed bar pilot, H. Hargrove; her chief mate, Nordahl; and a helmsman, Pedersen. There was no separate lookout standing forward. The vessel was proceeding under the con of the bar pilot. The Master was standing by on the bridge. The mate was standing by the engine room telegraph and the radar which was in operation. The helmsman had the wheel.

On the bridge of the MARTHA ANN there was also a licensed bar pilot, S. E. Dorgan; the vessel's master, D. Gough; and a helmsman, McKinsey. The master was handling the engine room telegraph (there were two of them, to both engines) and the helmsman was at the wheel. A man had been stationed forward on the MARTHA ANN as a lookout.

Both vessels became aware of the existence of each other when they were several miles apart. At the time they sighted each other, and for some little time after that, each followed a course approximately at the center of the Mobile Bay Dredged Ship Channel, as is customary.

The vessels were approximately three quarters of a mile apart when they commenced to maneuver for passing. Each turned to its own starboard. Captain Dorgan, the pilot aboard the MARTHA ANN, states that he ordered a change of

course from 172 degrees to 174 degrees, an order which was followed. On the CEARA, the course was changed approximately 4 degrees to starboard, a change which was held for a short period, and then the vessel was steadied up on the right (or east) side of the channel. It appears that each of the vessels observed the other vessel make this maneuver.

At about the time of maneuvering to starboard, the CEARA sounded a one whistle blast, and the pilot and mate on the CEARA state they heard a one whistle blast in response. On the MARTHA ANN, it is said that a one whistle blast was sounded at about this time, but that no signal was heard coming from the CEARA.

Also at the time the maneuver to pass was commenced, the CEARA reduced her engine speed from full speed ahead to half speed ahead. At half speed ahead she made about 11 knots, or approximately the same speed which the MARTHA ANN made at full ahead.

It appeared that an ordinary passing was about to occur. Then the MARTHA ANN commenced to sheer to her port. Observing this sheer to port, Captain Dorgan ordered right on the rudder of the MARTHA ANN. The sheer increased in intensity, and Captain Dorgan ordered hard right on the MARTHA ANN'S rudder.

The sheer increased still further. Seeing the imminence of collision, Captain Dorgan ordered full astern on the starboard engine on the MARTHA ANN. This signal was conveyed to the engine room by the master of the MARTHA ANN. The engineer from the MARTHA ANN has said that he had received the full astern signal, and had stopped the starboard engine, and had started it astern (though it was not going full astern) by the time the collision occurred.

There is some evidence from the MARTHA ANN to the effect that the sheer of the MARTHA ANN decreased somewhat just before the collision.

There seems no question but that the MARTHA ANN did sheer, as described. This is acknowledged by both the master of the MARTHA ANN and her pilot, the latter basing his conclusion not only on the appearance in the immediate area, but on his observation of lights on a dredge in a fixed position, some distance down the bay. This is further supported by the orders of the pilot of first "right rudder", followed by "hard right rudder". Captain Dorgan further states that he checked the helm to see if it had been turned hard right.

Furthermore, the sheer of the MARTHA ANN was observed by those on the bridge of the CEARA. As the vessels proceeded in what had been thought to be a normal passing, the green light of the MARTHA ANN disappeared from view of those on the bridge of the CEARA. Probably it was when that green light reappeared in the view of those on the CEARA that they realized that the MARTHA ANN had commenced to sheer. The estimates that we have of the distance of the two vessels apart, at this time, are consistent. Both pilots and both masters estimate a distance between the vessels of about 300 feet.

Captain Hargrove, aboard the CEARA, observing the sheer, and in an effort to avoid it, first ordered the rudder of the CEARA to starboard to give the MARTHA ANN more of the channel. Captain Hargrove noted that the MARTHA ANN was taking more of a sheer and blew his danger signal. The helm was put to starboard hard, and the engines ordered full ahead. Thereafter the helm was put hard to port in an effort to keep the stern away or out of the collision.

The MARTHA ANN struck the CEARA at a position forward of amidship and opened a gash in her port side running approximately 120 feet. The angle of the collision was about 35 to 45 degrees. After the collision, the CEARA found herself on the ground on the east bank of the channel about a half mile north of beacon No. 34. There were no personal injuries suffered.

■ On these facts, it is my opinion that the sheer of the MARTHA ANN is presumptive evidence of negligence and places on the MARTHA ANN the burden of showing some defense, or some fault on the part of the CEARA which contributed to the collision. See Atlantic Mutual Insurance Co. et al. v. The Bulk-crude, et al., D.C., 107 F.Supp. 771, 1952 A.M.C. 1400; The Eureka No. 91, D.C., 67 F.Supp. 101, 1946 A.M.C. 694; United States v. Mobile Towing and Wrecking Co., D.C., 144 F.Supp. 472, 1956 A.M.C. 2013.

The MARTHA ANN has attempted to do both things. It seeks (1) to raise by way of defense the suggestion of inevitable accident. It further seeks (2) to show fault on the part of the CEARA based on the CEARA'S failure to carry a lookout on her bow, and (3) based on the failure of the CEARA to carry out the full ahead order which was given, as I have mentioned above. I will take these up in the order I have stated them.

■ It is to be noted that the MARTHA ANN does not explain, and claims she cannot explain, why the sheer occurred. Under the circumstances, it is my thought that the following, from Griffin on Collision, Section 240, is in point:

"In cases where the cause of the accident is shown, the question is whether that cause or its operation could have been avoided by the use of reasonable care. But where the cause cannot be exactly determined, it is, according to the decisions, necessary that the defending vessel, in order to establish inevitable accident, specify all of the possible causes and prove that each one of them was unavoidable. The leading case on this subject is the Merchant Prince, (1892) Pro.Div. 179."

Here we have a situation in which a vessel was proceeding normally until about the time her helm was ordered to the right. She started to turn to the left. Her helm was ordered hard right and the vessel went hard to the left. No explanation is offered as to why this should occur.

There has been testimony which attempts to negative the thoughts: that the MARTHA ANN smelled the bank; that the helm was in fact put to the left when actually ordered to the right; that there was trouble with the steering arrangements of the MARTHA ANN; and that the engines did not all act pursuant to the orders as I have mentioned. These are steps intended to eliminate the presumption that there was fault on the part of the MARTHA ANN or her people which caused this sheer; and to cover all possible causes of the sheer.

In this context, I think these things may be of significance: the helmsman aboard the MARTHA ANN has testified that he was steering by compass, and that his compass course before the maneuver was made to pass the CEARA was 172 degrees. On orders of the pilot, he changed the course to 174 degrees. He has testified that from that time, that is, from the time his compass came to 174 degrees, there was no change in compass heading until he actually left the helm. This was presumably only seconds before the striking.

Nonetheless, he also states that he turned the wheel to right on the pilot's order after reaching 174 degrees; and subsequently to hard right. Something certainly is wrong here. It could be the accuracy of the story told by the helmsman of the MARTHA ANN; it could have to do with the performance of the steering mechanism on that vessel. It could involve the direct contradiction to the testimony of the pilot and the master aboard the MARTHA ANN, who have stated the vessel was turning hard left during this very period. In any event, no satisfactory explanation is made of this remarkable situation.

It justifies me in discounting the helmsman's testimony that he turned hard right when ordered to do so by the pilot, and opens the possibility that he actually turned left, which would have accounted for the whole situation.

The other matter, which seems to me unsatisfactorily dealt with, is the situation touching the steering mechanism of the MARTHA ANN. True, evidence from the vessel is to the effect that nothing has been found wrong with the steering arrangements. Perhaps the strongest support for this arises from the fact that the MARTHA ANN actually did maneuver back into the port of Mobile without any known repairs or changes to the steering mechanism, and the vessel responded properly to her helm.

The steering machinery is a product of the Sperry Rand Corporation, and was tested by a Sperry representative on the day following the collision, November 8, 1960. That representative's report has been admitted and discloses that he turned the system on and found that it operated the rudder satisfactorily from which he concluded that " * * * at this time the steering system appears to be operating satisfactory * * * " The report also notes that the writer performed no services at that time nor at any other time on the steering system aboard the vessel.

The significance of this seems to me to lie in the fact that there has been no adequate evidence introduced to show that the steering apparatus might not have gone wrong at the crucial time here involved. In view of the situation with which we are concerned, this seems to me to be of the utmost importance.

The comments of the court in The Lackawanna, 2 Cir., 210 F. 262 seem to me to be in point:

"If the gear broke down with the wheel a little to port, we cannot see why a violent sheer to starboard followed. We are not told whether the rudder was loose or what caused the steering gear to break down. It may have been the result of a defect in the steering engine or of the steersman's negligent handling of the wheel. These are among the possible causes which are not eliminated."

Reverting to Section 240 of Griffin, he proceeds (still referring to the Merchant Prince):

"But the Court of Appeal held that, so long as the cause of accident was unknown, it could not be said that that cause had been shown to be unavoidable, saying (per Lord Esher, M. R.):

" 'As I understand it, the law is perfectly clear that in the circumstances such as I have described the defendants are bound to show that what happened was inevitable. In this case it is beyond dispute that the defendants are unable to tell what the cause of the accident was, or how or why it happened. It occurs to me that that being so, it cannot be said that they have discharged the burden fastened upon them by showing that what happened was inevitable. Can they say that they could not avoid a thing when they did not know what the thing to be avoided was? I think not.' "

I do not think the defendants have carried their burden of showing that this accident resulted from an inevitable accident.

The CEARA did not have a lookout on her bow. She did sight the MARTHA ANN when the vessels were two or more miles apart. She maneuvered for a passing in ample time. There were no maneuvers that she made or which she failed to make which would have been changed had a lookout been stationed on the bow. In other words, I do not see that the absence of a lookout on the bow of the CEARA had any bearing whatsoever on the collision.

"It is well settled that the absence of a lookout will not produce liability where it is clear that it had nothing at all to do with the happening of the accident." Yacht Bob-Tom II CG 64300, Dion v. United States, D.C., 199 F.Supp. 705, 1962 AMC 1086.

The CEARA, having observed the MARTHA ANN sheering rapidly to the MARTHA ANN'S own port, took a turn to her right; then ordered hard right on her helm and full ahead on her engines. The helm of the CEARA did go hard right and it is estimated that she turned as much as 45 degrees.

The evidence from the CEARA discloses that a full ahead order was given on the engine room telegraph, followed by stop and full astern about 4 seconds later; but the full astern order was never carried out by the engineer on watch.

The reason the MARTHA ANN presses this as a contributing fault on the part of the CEARA is the suggestion that the full ahead speed of the CEARA might have moved the CEARA further on than she would have gone with her half ahead speed, thereby, presumably, taking her out of the way of the MARTHA ANN.

■ I find this insistence of the MARTHA ANN unacceptable for several reasons. At the outset it is to be noted that the CEARA'S engineer has testified that he thought the CEARA had gone aground (this on the east side of the channel; a fact confirmed by other witnesses, and not in dispute). He does not recall a full ahead order, but does recall the stop order. He states that he had started slowing the throttle, or reducing the revolutions of the propeller, before he actually received the stop order, and this because the vessel was aground, a fact he was able to tell by reason of the change in vibration of the vessel.

We have the estimate of Captain Hargrove that the full ahead order was given about 4 seconds before the stop order. It is not shown for how long the engineer had been aware that the CEARA was aground before the stop order, but he had become aware of it and had started reducing the throttle by the time he received the stop order. Accepting this, there could have been no time lapse permitting any effective action between full ahead order and the realization by the engineer that the CEARA was aground. We are talking here, it is to be recalled, in terms of a time lapse of less than 4 seconds.

As to the accuracy of the engineer's impression, it is to be remembered that the CEARA did go aground on the east side of the channel. Captain Hargrove thinks she went aground before the collision. Also, her physical location and movements before the collision consisted with this. A full ahead movement under the circumstances would have been futile.

Furthermore, it is to be recalled that the evidence is to the effect that the vessels were about 300 feet apart when the fact of the MARTHA ANN'S sheer was first observed aboard the CEARA. Both vessels were moving at 11 knots or somewhat more. On this basis, it may be calculated that less than 9 seconds elapsed from the time those on the bridge of the CEARA first observed the sheer of the MARTHA ANN until the collision actually occurred. There has been evidence introduced disclosing that it would have taken in excess of this time for the speed of the CEARA appreciably to increase on a change from half ahead to full ahead. The testimony is uncontradicted that it would have taken five seconds simply to have gotten the CEARA'S propeller going from half ahead to full ahead. Again for the CEARA to have gone full ahead would have been futile.

I believe had there been any error on the part of the engineer of the CEARA, a suggestion emphatically denied by the CEARA, it would have been one in *extremis*. See The Favorita, 18 Wall. 598, 85 U.S. 598, 21 L.Ed. 856:

"It is said that if the Manhasset had advanced instead of stopping she would have cleared the steamship. This may or may not be true, but, if true, she is not in fault for this error of judgment. It was a question whether to stop or back, and the emergency was so great

that there was no time to deliberate upon the choice of modes of escape."

Accordingly, I find the MARTHA ANN at sole fault in the collision, and the libel of the MARTHA ANN (Admiralty No. 2869) shall be dismissed. The libelant in Admiralty 2868 shall recover his damages which are as follows:

| | |
|---|---:|
| Alabama Dry Dock & Ship-building Company | $39,765.00 |
| Alabama Dry Dock and Shipbuilding Company (for painting bottom) | 480.00 |
| International Farvefabrik A/S paint (cost of the bottom paint used) | 410.83 |
| Alabama State Docks—November 7 to November 10, Dockage and Sheddage | 265.19 |
| Mobile Towing & Wrecking Company, Bill 11/10/60—Shift North B to No. 2 South E | 198.88 |
| Mobile Towing & Wrecking Company—11/18 Assist shift from South E to B #1 | 153.75 |
| Mobile Harbor Pilots—Shifting fee, North B, State Docks to South E, Alabama Dry Dock | 48.69 |
| Mobile Harbor Pilots—Shifting from Alabama Dry Dock to North B #1 | 41.00 |
| Cooper Stevedoring Company, Inc. Labor for un-docking vessel Pier B North 2—November 10 | 21.53 |
| Cooper Stevedoring Company, Inc., Labor for docking vessel Pier B North 1—November 18 | 21.53 |
| Cooper Stevedoring Company, Inc., for discharging certain New Orleans Cargo—November 10, 1960 | 410.21 |
| Cooper Stevedoring Company, Inc., Extra Labor—November 10, 1960 —Discharging empty vans, New Orleans Cargo | $ 29.53 |
| Cooper Stevedoring Company, Inc., Extra Labor —November 15, 1960— Loading New Orleans Cargo | 116.66 |
| John M. Brining, Custom House Broker, Services with regard to New Orleans Cargo | 41.51 |
| Telegram—Master to Owner—11/7/60 | 11.56 |
| Radiogram—Alcoa to Master—11/8/60 | 7.93 |
| Long Distance Telephone Call—Master to Surveyor | 2.66 |
| Surveyor's fee and expenses | 1,273.00 |
| An off-hire certificate from Alcoa Steamship Company shows a total off-hire period of 10 days, 11 hours and 11 minutes and that 23.7 barrels of diesel fuel valued at $3.69 per barrel were consumed during that period | 8,928.78 |
| Value of diesel fuel consumed during the off-hire period | 89.64 |
| Captain A. Friisoe—Deck and Engine stores consumed while undergoing repairs | 36.45 |
| Adjusting standard compass after leaving the shipyard | 164.00 |
| Travel expenses to and from the U. S. Coast Guard hearings. (3 days) | 7.00 |
| | $52,525.33 |